786 A.2d 695

**Marion Fransisca DUNNUCK**

**v.**

**STATE of Maryland.**

**No. 36, Sept. Term, 2001.**

Court of Appeals of Maryland.

Dec. 14, 2001.

Nancy S. Forster, Deputy Public Defender (Stephen E. Harris, Public Defender, on brief) of Baltimore, for petitioner/cross-respondent.

Devy Patterson Russell, Asst. Atty. Gen., (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief) of Baltimore, for respondent/cross-petitioner.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

BELL, Chief Judge.

In this case, the issue that we must decide involves the interplay between Maryland Code (1957, 2000 Repl.Vol.) Article 27, § 594B and the limitations that the Fourth Amendment to the United States Constitution places on the right of the police to effect a warrantless arrest in a defendant's home. We shall hold that § 594B did not authorize the arrest at issue in this case and, so, reverse the judgment of the Court of Special Appeals.

The Supreme Court of the United States has considered and discussed, at length, the permissible limits of warrantless arrests.[1] *See Welsh v. Wisconsin,* 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984); *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). In *Payton,* the Court reversed convictions in companion cases in which the police, who had ample time to have obtained a warrant, entered private residences without a warrant and, in the absence of exigent circumstances justifying the entry, in one case, *Riddick v. New York,* 445 U.S. at 578, 100 S.Ct. at 1375, 63 L.Ed.2d at 646, effected an arrest of the accused. Explaining that "the warrantless arrest of a person is a species of seizure required by the [Fourth] Amendment to be reasonable" and that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," the Court held: "it is a 'basic principle of Fourth Amendment Law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.,* 445 U.S. at 585, 586, 100 S.Ct. at 1379, 1380, 63 L.Ed.2d at 650, 651 (quoting *United States v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972)).

▮▮▮▮▮ "The Fourth Amendment," the Court further elaborated, "has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." 445 U.S. at 590, 100 S.Ct. at 1382, 63 L.Ed.2d at 653. *Payton,* therefore, stands firmly for the proposition that the Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." 445 U.S. at 576, 100 S.Ct. at 1375, 63 L.Ed.2d at 645.

---

1. Before it had the occasion to address the issue, the Supreme Court of the United States recognized as "a grave constitutional question ... whether the forceful nighttime entry into a dwelling to arrest a person reasonably believed within, upon probable cause that he had committed a felony, under circumstances where no reason appears why an arrest warrant could not have been sought, is consistent with the Fourth Amendment." *Jones v. United States,* 357 U.S. 493, 499–500, 78 S.Ct. 1253, 1257–58, 2 L.Ed.2d 1514, 1519–20 (1958).

*See also Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436, 440 (1948) ("The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent"); *Taylor v. United States,* 286 U.S. 1, 6, 52 S.Ct. 466, 467, 76 L.Ed. 951, 953 (1932) ("Prohibition officers may rely on a distinctive odor as a physical fact indicative of possible crime; but its presence alone does not strip the owner of a building of constitutional guaranties (Const.Amend. 4) against unreasonable search"); *Agnello v. United States,* 269 U.S. 20, 33, 46 S.Ct. 4, 6, 70 L.Ed. 145, 149 (1925) ("Belief, however well founded, that an article sought is concealed in a dwelling house, furnishes no justification for a search of that place without a warrant. And such searches of that place are held unlawful notwithstanding facts unquestionably showing probable cause"); *United States v. McCool,* 526 F.Supp. 1206, 1208 (M.D.Tenn.1981).

The principles announced in *Payton* were applied and elucidated in *Welsh, supra.* In that case, the issue for the Court's resolution was the propriety of the accused's arrest for noncriminal traffic charges by officers who entered his home in the nighttime without a warrant. Acknowledging that the gravity of the offense for which the accused is arrested is an important factor in the determination of whether exigency exits, 466 U.S. at 753, 104 S.Ct. at 2099, 80 L.Ed.2d at 745, the Court concluded that the arrest in that case was not justified by any exigency in light of the minor nature of the offense involved. 466 U.S. at 753–54, 104 S.Ct. at 2099–2100, 80 L.Ed.2d at 745–46. Moreover, in discussing the applicable principles, the Court made clear that "[b]efore agents of the government may invade the sanctity of the home, the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." 466 U.S. at 750, 104 S.Ct. at 2098, 80 L.Ed.2d at 743. The Court stated explicitly

that "no exigency is created simply because there is probable cause to believe that a serious crime has been committed," 466 U.S. at 753, 104 S.Ct. at 2099, 80 L.Ed.2d at 745, and, further, that

> "[E]xceptions to the warrant requirement are 'few in number and carefully delineated,' *United States v. United States District Court, supra,* [407 U.S.], at 318 [, 92 S.Ct. at 2137, 32 L.Ed.2d at 767], and that the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests. Indeed, the Court has recognized only a few such emergency conditions, *see, e.g., United States v. Santana,* 427 U.S. 38, 42–43 [, 96 S.Ct. 2406, 2409–2410, 49 L.Ed.2d 300] (1976) (hot pursuit of a fleeing felon); [2] *Warden v. Hayden,* 387 U.S. 294, 298–299 [, 87 S.Ct. 1642, 1645–1646, 18 L.Ed.2d 782] (1967) (same); *Schmerber v. California,* 384 U.S. 757, 770–771 [, 86 S.Ct. 1826, 1835–1836, 16 L.Ed.2d 908] (1966) (destruction of evidence); *Michigan v. Tyler,* 436 U.S. 499, 509 [, 98 S.Ct. 1942, 1949, 56 L.Ed.2d 486] (1978) (ongoing fire), and has actually applied only the 'hot pursuit' doctrine to arrests in the home, *see Santana, supra.*"

*Id.,* 466 U.S. at 749–50, 104 S.Ct. at 2097, 80 L.Ed.2d at 743.

■ Thus, it is well settled that the Fourth Amendment to the United States Constitution is not infringed when a warrantless search and seizure of a dwelling is conducted pursuant to exigent circumstances. *Michigan v. Tyler,* 436 U.S. 499, 509, 98 S.Ct. 1942, 1949, 56 L.Ed.2d 486, 498 (1978); *United States v. Santana,* 427 U.S. 38, 42–43, 96 S.Ct. 2406, 2409–10, 49 L.Ed.2d 300, 305–06 (1976); *Warden v. Hayden,* 387 U.S.

---

**2.** For purposes of an officer's effecting an arrest, Maryland law defines "fresh pursuit" as follows:

"(a)(1) 'Fresh pursuit' means pursuit under the circumstances listed in subsection (c) of this section.

(2) This pursuit shall be continuous and without unreasonable delay, but does not require instant pursuit. In determining if the pursuit meets these elements, the court shall apply the requirements of the common-law definition of fresh pursuit which pertains to these elements."

Md.Code (1957, 2000 Repl.Vol.) Article 27, § 602A.

294, 298–300, 87 S.Ct. 1642, 1645–46, 18 L.Ed.2d 782, 787–88 (1967); *Schmerber v. California,* 384 U.S. 757, 770–71, 86 S.Ct. 1826, 1835–36, 16 L.Ed.2d 908, 919–20 (1966); *Ker v. California,* 374 U.S. 23, 37–41, 83 S.Ct. 1623, 1632–34, 10 L.Ed.2d 726, 740–42 (1963). Our cases, *see e.g., Carroll v. State,* 335 Md. 723, 729, 646 A.2d 376, 379 (1994); *Oken v. State,* 327 Md. 628, 646, 612 A.2d 258, 267 (1992); *McMillian v. State,* 325 Md. 272, 281, 600 A.2d 430, 434 (1992); *Stackhouse v. State,* 298 Md. 203, 211–12, 468 A.2d 333, 338 (1983); *Lebedun v. State,* 283 Md. 257, 278, 390 A.2d 64, 73 (1978); *Nilson v. State,* 272 Md. 179, 191, 321 A.2d 301, 307 (1974); *Davis v. State,* 236 Md. 389, 395, 204 A.2d 76, 80 (1964), *cert. denied,* 380 U.S. 966, 85 S.Ct. 1113, 14 L.Ed.2d 156 (1965), and those of the Court of Special Appeals, *e.g. Bellamy v. State,* 111 Md.App. 529, 534–35, 682 A.2d 1185, 1187–88 (1996); *Torres v. State,* 95 Md.App. 126, 129, 619 A.2d 566, 568 (1993); *Smith v. State,* 72 Md.App. 450, 456–60, 531 A.2d 302, 305–07 (1987); *Lett v. State,* 51 Md.App. 668, 672–73, 445 A.2d 1050, 1053–54 (1982), are in accord.

The "exigent circumstances" exception is a narrow one; "exigency' implies urgency, immediacy, and compelling need.'" *Stackhouse,* 298 Md. at 212, 468 A.2d at 338. Thus, we have explained, *see Carroll,* 335 Md. at 729, 646 A.2d at 379 (quoting *Michigan v. Tyler,* 436 U.S. at 509, 98 S.Ct. at 1949, 56 L.Ed.2d at 498), that, whenever a "compelling need for official action and no time to secure a warrant" converge, exigent circumstances exist. Stated differently, "[e]xigent circumstances are 'those in which a substantial risk of harm to the persons involved or to the law enforcement process would arise if the police were to delay a search until a warrant could be obtained.'" *Wengert v. State,* 364 Md. 76, 85, 771 A.2d 389, 394 (2001) (quoting *United States v. Robertson,* 606 F.2d 853, 859 (9th Cir.1979)). *See McDonald v. United States,* 335 U.S. at 459–460, 69 S.Ct. 191 (Jackson, J. concurring) ("When an officer undertakes to act as his own magistrate, he ought to be in a position to justify it by pointing to some real immediate and serious consequences if he postponed action to get a warrant"). Relevant to the determination of whether exigent

circumstances justifying a warrantless arrest effected in a private residence are present is the opportunity of the police to have obtained a warrant. *See Payton,* 445 U.S. at 583, 100 S.Ct. at 1378, 63 L.Ed.2d at 648–49; *Welsh,* 466 U.S. at 749–50, 104 S.Ct. at 2097, 80 L.Ed.2d at 743. *See also Smith v. State,* 72 Md.App. 450, 464, 531 A.2d 302, 309 (1987) ("in reviewing the legality of a warrantless arrest effected in a private residence, the presence or absence of exigent circumstances, which necessarily involves an assessment of the opportunity of the police to have obtained a warrant prior to invading the residence to make the warrantless arrest, is a highly relevant factor to be considered by a reviewing court and, indeed, is critical, analytically, to that determination."), citing *United States v. McCool,* 526 F.Supp. 1206, 1209 (M.D.Tenn.1981). We have found exigent circumstances where there is reason for the police to believe that a burglary recently had occurred, *Wengert,* 364 Md. at 85, 771 A.2d at 389; *Carroll,* 335 Md. at 730, 646 A.2d at 379, or where they reasonably believe injured persons or suspects may still be on the premises. *Oken,* 327 Md. at 646, 612 A.2d at 267, but not when there is no risk of the destruction or removal of evidence. *McMillian,* 325 Md. at 281, 600 A.2d at 434. The burden of establishing exigent circumstances is on the State. *Stackhouse,* 298 Md. at 217, 468 A.2d at 341.

■ The exception for exigent circumstances is construed narrowly. *Buie v. State,* 314 Md. 151, 160, 550 A.2d 79, 84 (1988); *Stackhouse,* 298 Md. at 215–216, 468 A.2d at 340. The exigent circumstances, therefore, must be genuine, *Stackhouse,* 298 Md. at 216, 468 A.2d at 340; *see Commonwealth v. Huffman,* 385 Mass. 122, 430 N.E.2d 1190, 1191–92 (1982); *Howe v. State,* 112 Nev. 458, 916 P.2d 153, 159–61 (1996); *State v. O'Herron,* 153 N.J.Super. 570, 380 A.2d 728, 733 (1977); *State v. Kesler,* 111 Ohio App.3d 98, 675 N.E.2d 875, 879 (3d 1996); they cannot be created or precipitated by police actions or conduct designed to have that result. *Spiering v. State,* 58 Md.App. 1, 12, 472 A.2d 83, 89 (1984). *See United States v. Duchi,* 906 F.2d 1278, 1284 (8th Cir.1990) ("We have recently held, adopting the view consistently taken by our

sister circuits, that the situations of urgency protected by this exception cannot be created by police officers"); *United States v. Morgan,* 743 F.2d 1158, 1163, (6th Cir.1984), *cert. denied,* 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985) (No exigency where the arrest is "a planned occurrence, rather than the result of an ongoing field investigation"); *Hornblower v. State,* 351 So.2d 716, 718 (Fla.1977) ("[T]he suspicious movement which occurred when the police announced their presence cannot supply the exigent circumstances for the warrantless search"); *State v. Schur,* 217 Kan. 741, 538 P.2d 689, 695 (1975) ("[I]t is our conclusion that if any exigency existed it was created by the acts of the officer"); *State v. Wagoner,* 126 N.M. 9, 966 P.2d 176, 180 (1998), citations omitted ("[T]he exigency should not be one improperly created by law enforcement officers.... [C]ourts will not permit a warrantless entry if it appears that the officers have organized their conduct for the purpose of creating an exigency that presumably would justify a warrantless entry"); *State v. Jenkins,* 104 Ohio App.3d 265, 661 N.E.2d 806 (1995) (probable cause cannot justify warrantless entry precipitated by exigent circumstances of the police's own making.); *State v. Williams,* 615 N.E.2d 487 (Ind.Ct.App.1993) (although the officers had probable cause to believe drugs present in the defendant's residence, the police created the "emergency" by knocking on the door); *State v. Kelgard,* 40 Or.App. 205, 594 P.2d 1271, 1273 (1979) ("... whether exigent circumstances exist is normally determined at the time the officer with probable cause decides whether to proceed with or without a warrant. The officer who chooses to act without a warrant cannot create his own exigent circumstances by a premature confrontation with a potential defendant"); *State v. Kiekhefer,* 212 Wis.2d 460, 569 N.W.2d 316, 326 (App.1997) ("Here the agents' conduct-an unannounced warrantless entry-created any potential danger, and the exigent circumstances resulting from that conduct cannot justify the warrantless entry").

Maryland Code (1957, 2000 Repl.Vol.) Article 27, § 594B, as relevant, provides:

"(a) A police officer may arrest without a warrant any person who commits, or attempts to commit, any felony or misdemeanor in the presence of, or within the view of, such officer.

(b) A police officer who has probable cause to believe that a felony or misdemeanor is being committed in the officer's presence or within the officer's view, may arrest without a warrant any person whom the officer may reasonably believe to have committed such offense."

Pursuant to this statute, an officer who witnesses the commission of a felony or misdemeanor, or who simply has probable cause that a felony or misdemeanor is being committed in his or her presence, may arrest the perpetrator or suspected perpetrator, without the necessity of obtaining a warrant.

On this authority and that of *Griffin v. State,* 200 Md. 569, 574, 92 A.2d 743, 745 (1952), *cert. denied,* 345 U.S. 907, 73 S.Ct. 647, 97 L.Ed. 1343 (1953), in which this Court "specifically h[e]ld that it is lawful for a police officer without a warrant to enter and search a dwelling when he can see from the outside that a crime is being committed," and recalling the observation of the Court of Special Appeals in *Brown v. State,* 15 Md.App. 584, 605, 292 A.2d 762, 774 (1972), that "a valid visual observation ... furnishes probable cause for ... the warrantless entry to effect an arrest for a crime being committed in the officer's presence," the Court of Special Appeals, in an unreported opinion, held that "[w]here, from a lawful vantage point outside a private home, a law enforcement officer observes an offense being committed inside the home, the officer may forcibly enter the home to make an arrest." Squarely presented by this case, then, is the issue whether the arrest authority prescribed by § 594B "trumps," to use the petitioner's word, the limitations that the Fourth Amendment to the United States Constitution[3] imposes on the power

---

**3.** All of the petitioner's arguments rely on the Fourth Amendment to the United States Constitution, which provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be

forcibly to enter a home to make a warrantless arrest.[4]

We now turn to the facts of the present case.

Late on the morning of June 8, 1999, Deputy John Meyers of the Queen Anne's County Sheriff's Department received an anonymous telephone call reporting that marijuana plants could be seen in a window of a "white house, single story house, just in front of the Tuck Davidson's Excavating business" on Flat Iron Square Road, which was "maybe about 15 minutes" from the courthouse in Centreville. Having notified his partner, Detective Bruce Layton, and unsuccessfully attempting to reach his supervisor for instructions as to how to proceed, Deputy Meyers and Det. Layton drove to the described location and from the driveway of the excavating business, observed, as also described, what they believed to be marijuana in a birdcage in a side window. Det. Layton knocked on the front door of the house. When there was no answer, he and Deputy Meyers drove approximately one eighth of a mile to a parking lot, from which they still could see the house. There, Deputy Meyers received a response to his page to his supervisor, who advised that they should ascertain whether someone was home and try to obtain consent to search, but if no one was at home, or came back within

---

violated, and no warrant shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

**4.** Both parties briefed and argued whether the offense of possession of marijuana is a sufficiently serious offense to permit police entry into a home, without a warrant, to effect an arrest. The petitioner argues, of course, that it is a minor offense, not serious enough to support a warrantless entry into a defendant's home to effect an arrest, *see, e.g., Haley v. State,* 696 N.E.2d 98, 103 (Ind.App.1998); *State v. Robinson,* 103 Ohio App.3d 490, 659 N.E.2d 1292, 1296 (1995); *State v. Ramirez,* 49 Wash.App. 814, 746 P.2d 344, 346 (1987), and the State argues the opposite, *see, e.g., State v. Hughes,* 233 Wis.2d 280, 607 N.W.2d 621, 628 (2000); *see generally Blanton v. City of North Las Vegas,* 489 U.S. 538, 543, 109 S.Ct. 1289, 1293, 103 L.Ed.2d 550, 556 (1989) (recognizing that crimes punishable by more than 6 months imprisonment are not petty offenses). We do not reach the issue, concluding, as we do, that there was no exigency in any event.

a short time, to go and get a search warrant.[5]  Although they were aware that no one was at home, rather than go and get a search warrant as they were advised to do, the officers called for back up units to "sit on the residence and see if somebody did return to the residence and then we would possibly get a search warrant for the house."

It was 1:00 p.m. when Deputy Meyers and Det. Layton drove up to the house and saw the marijuana.  It was about 2:00 p.m. when Trooper Guyer, one of the back-up units for which they had called, arrived.  The petitioner arrived shortly thereafter and went inside the house.  Sometime after the petitioner's arrival and entry into the house—from ten to fifteen minutes—Deputy Meyers, Det. Layton, Trooper Guyer and Corporal Deward Coner, also of the Sheriff's Department, approached the petitioner's house.  Before their actual arrival, about three minutes before they approached the front door, however, according to Deputy Meyers, a pick-up truck drove into the driveway next door to the petitioner's house and kept going, but not before Deputy Meyers observed that the driver looked "at us really suspiciously." [6]  Deputy Meyers also stated that he thought that the truck was going into the petitioner's driveway.

All of the officers, except Deputy Meyers, who was stationed at the window at which the birdcage containing the marijuana could be seen, approached the front door.  Det. Layton testified that he knocked on the door and, in response, the petitioner "opened the venetian blinds and asked who is it," to which the detective replied, "Queen Anne's County

---

5.  Deputy Meyers's testimony on this point was:
    "[His supervisor, Sergeant Branham] told me if nobody came back to the residence within a short period of time, if we knew it was going to be a long period of time before anybody would get back to the residence, to go and seek a search warrant."

6.  The record reflects that Deputy Meyers and Det. Layton were in plain clothes and driving an unmarked car.  While Trooper Guyer was driving her marked unit, the evidence was that she was working undercover and, so, to protect her identity, she put a mask over her face.  There is nothing in the record as to how Cpl. Coner was attired.

Drug Task Force. We need[ ] to come in." Shortly after the petitioner asked them to "hold on a minute," [7] Deputy Meyers yelled that the plants were moving, prompting Det. Layton to begin "kicking on the door." Deputy Meyer's testimony was consistent. He testified to hearing footsteps and then seeing the "cage shaking back and forth," causing him to believe that the marijuana plants were about to be destroyed and, thus, to inform his fellows that they were moving.

The officers gained entry to the house.[8] Notwithstanding her election, after being given Miranda warnings,[9] not to speak to the officers "unless she had her attorney with her," the petitioner was asked to consent to a search of her house. Having explained that he could get a warrant "or she could consent to a search of her residence," to assist the petitioner in making the choice, Deputy Meyers further advised that they would "seize" the house, so that "[n]obody could go in and we were going to go to obtain a search and seizure warrant" and that "it would be a lot faster" if the petitioner signed the consent to search form. The petitioner signed the consent to search form and, as a result of the search conducted pursuant to it, the marijuana plants and paraphernalia used to grow them were seized.

The petitioner moved to suppress the evidence. The motion was denied by the Circuit Court for Queen Anne's County, the court reasoning:

---

7. The petitioner denied opening the venetian blinds or even getting to the door, even though she acknowledged that she responded to the police knock by telling them to hold on a minute, as she had to get dressed.

8. The testimony is conflicting as to whether the petitioner opened the door or the police kicked the door in. The State's testimony was to the former effect, while the petitioner testified that it was the latter. Both Det. Layton and Deputy Meyers confirmed the petitioner's testimony that she was naked when the police gained entry. The court did not clearly resolve the conflict, stating that it was "not sure that it makes a terrible amount of difference," given its view of the case.

9. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

"Well, I don't—as I indicated, the crime being committed was so obvious. Certainly was a crime to the trained eyes of the police officers, who did the best they could with what they had. Initially, there was no one at home.

They had the episode with the one truck that went by that the one officer, so it's thought, driven into the lane and looked at them suspiciously. Which is the whole purpose of being there, to [secure] the place, to make certain that nobody got suspicious or destroyed any evidence.

At the point where they had the person, they might have been. In the meantime, the defendant had returned at home. So they wait to see what could be done in the way of gentle suasion, if you will, or just conversation. To say that the owner of that house was caught red handed is to say it all because there was no question about what was there. There was no question about the fact that the person in possession of that house should be arrested and brought to trial for the propagation of marijuana.

So they went there. By the defendant's own admission, they first knocked on the door. She says she was coming to the door. They asked her and said she was coming. The officer at the back, Mr. Meyers, heard nothing except footfalls and then what he believed to be, on a completely still day, that these plants, this contraband, was—this corpus delicti contraband, seizable of a crime, was being removed in response to knocking at the door.

At this point, he signals his compatriot at the front door and there were fears, that the reason they were staking out the place and to protect their evidence, is about to be frustrated because their evidence is about to be destroyed or in the process of being destroyed, so the officer at the front kicks at the door. He says that this did not succeed in opening the door. The defendant would have us believe that it does.

The officer indicates that someone came and looked through, what I assume is a Venetian blind or something and looked outside and said open the door for us. I'm not sure that it makes a terrible amount of difference because

as I said, I think the police had the absolute right to, because they were acting properly, based upon reasonable suspicion and infinitely more than probable cause to believe that a crime was being committed. And based upon an articulable and quite reasonable belief that the evidence was being destroyed, they entered that property and obtained the evidence."

The petitioner's appeal to the Court of Special Appeals was, as we have seen, unsuccessful. We granted the petitioner's petition for writ of certiorari and the State's conditional cross appeal.[10]

■■■■■■ To be sure, as the trial court emphatically ruled, the officers had probable cause to believe that a crime, the possession of marijuana, at the least, was being committed in their presence. That occurred—the officers acquired probable cause—when they verified the anonymous tip that had been called in and saw for themselves that there was, indeed, from the vantage point described, marijuana in plain view in the window of the petitioner's house. Consequently, they could have sought a search and seizure warrant at that time. It is equally clear that, at that time, there were no exigent circumstances to support an immediate entry, without a warrant, into the petitioner's house. The police did not point to, nor could they have, "some real immediate and serious consequences" that would result had they waited to act until after they had obtained a warrant. *McDonald*, 335 U.S. at 460, 69 S.Ct. at 195, 93 L.Ed. at 161 (Jackson, J. concurring).

Certainly the record does not reflect any basis, not to mention reasonable basis, for the belief that the evidence, the marijuana plants, was in danger of being destroyed or removed. The burden in that regard was, as already indicated,

---

10. In its conditional cross appeal, the State asked this Court to decide whether the Court of Special Appeals "erroneously fail[ed] to address the trial court's conclusion that the imminent destruction of evidence justified the warrantless entry into [the petitioner's] home[.]" As will be apparent from the discussion *infra*, we address, and resolve, that issue.

*see Stackhouse,* 298 Md. at 217, 468 A.2d at 341, on the State. In fact, as far as the record reveals, the petitioner was not aware that the police had become aware of the contraband she possessed or had focused on her or her house. The tip about the marijuana plants was an anonymous one and no one was at home when the officers initially went to the petitioner's house. From the time that the police acquired probable cause to the time that the petitioner came home, at least an hour, the record would indicate that the petitioner was not aware of the police investigation and certainly did not know that they knew about her marijuana plants.

Even after the petitioner came home and entered her house, there is no evidence, and, again, it is the State's burden to produce it, that the petitioner was aware of the police presence and the reason for it. It was only when the police knocked on the door, announcing their presence and affiliation with the Drug Task Force and indicating that they "needed to come in," that the petitioner was placed on notice. In short, there were no exigent circumstances justifying, or warranting, police action without a warrant. And the State did not sustain its heavy burden of proving their existence. *O'Herron,* 380 A.2d at 733. Although the police officers acknowledged that they had probable cause and that the courthouse was no more than 15 minutes away, they provided no basis for failing to get a warrant except that it was necessary to secure the premises. Never did they offer evidence as to why, when the suspect is unaware of the investigation or that the police has probable cause to search her premises, the securing of the premises predominated over securing the warrant.

As in *Huffman,* 430 N.E.2d at 1191–92, the State offered no evidence as to the time it would take to get a warrant [11] or, more to the point, any "evidence that there was a specific

---

11. Nevertheless, the trial court commented that it might take some time to process a warrant application, noting the need for the police to fit within the schedule of the trial judges, Circuit Court and District Court, that the application would have to be typed, and that the judges might be in court, necessitating the officers' waiting. The court estimated that 2 hours might not be unrealistic.

threat that the marijuana was about to be destroyed or that to obtain a warrant would have thwarted the arrest." As in *O'Herron*, the police observed the marijuana plants in the birdcage, planted and growing, when the petitioner was not at home and the investigation that followed did not disclose any special urgency. 380 A.2d at 733. What the court in *Howe*, 916 P.2d at 160–61, said in reversing a conviction based on a warrantless search and seizure, is appropriate here as well: "If the officers truly believed the information they had [that the defendant possessed marijuana inside his home] that led to the investigation, they should have sought a warrant and then no danger of destruction would have existed, because [the defendant] would have been unaware that he was under suspicion."

The trial court found, and the State argues strenuously, that there was an exigency—"fears . . . that the reason they were staking out the place and to protect their evidence . . . is about to be frustrated because their evidence is about to be destroyed or in the process of being destroyed." To be sure, that fear was presented, and arguably, reasonably so; however, the precipitating cause for it was the actions of the police themselves. By knocking on the petitioner's door and announcing that they were with the Drug Task force and "needed" to come in, the police alerted the petitioner to their investigation, that she was a target of that investigation, and most likely, that the marijuana plants had been spotted, something that would not have occurred had they gotten the warrant and come to the house only to serve it. And by so doing, the police created the exigency that they rely upon to justify the warrantless entry into the petitioner's house and to excuse their failure to obtain a search warrant.

▮▮▮ Whether intended consciously or not, the necessary result of the police conduct in this case was to create an exigency that would justify a warrantless entry. Having seen the contraband as they were told they would and knocked on the petitioner's door and found no one at home, rather than going immediately to obtain a warrant, for the issuance of

which it is undisputed they had probable cause, the police gathered a short distance from the house and watched the house, after calling for back-up. Considering that no one was at home and, presumably, was aware of the police investigation, and that there was clear probable cause for believing that a crime was being committed, it is difficult to understand what securing the house meant, or was intended to accomplish.[12] Surveillance of the house would not enhance the probable cause, nor, unless the plants themselves were watched, with the potential that poses for alerting the target of the investigation, would it necessarily ensure the safeguarding of the evidence. Of course, confronting the occupant of the house and asking for permission to enter and search is, under the circumstances, "a premature confrontation," *State v. Kelgard,* 594 P.2d at 1273, which necessarily creates the danger that the evidence may be destroyed and, thus, the "emergency." *State v. Williams,* 615 N.E.2d at 488–89. *See also Hornblower v. State,* 351 So.2d at 718.

The Court of Special Appeals relied on *Griffin v. State, supra,* for the proposition that an officer may make a warrantless entry into a private dwelling when he or she can see from outside that a crime is being committed within. That case does not control the decision in this case and, in any event, to the extent that it is inconsistent with our decision today, it is overruled. In *Griffin,* the Court made clear that it was not deciding the case under the Fourth Amendment, noting, in fact, that "[t]he Fourth Amendment to the Constitution of the United States, which forbids unreasonable searches and seizures, is a limitation upon the powers of the Federal government." 200 Md. at 572, 92 A.2d at 745. The Fourth Amendment was made applicable to the states through the

---

12. It is true, of course, as the petitioner acknowledges, that, where the police have probable cause to believe a suspect's home contains evidence of a crime, under appropriate circumstances, that home may be impounded pending issuance of a search warrant. *See Illinois v. McArthur,* 531 U.S. 326, 328, 121 S.Ct. 946, 948, 148 L.Ed.2d 838, 846 (2001); *Byrd v. State,* 140 Md.App. 488, 490, 780 A.2d 1224, 1226 (2001).

Fourteenth Amendment only after the decision in *Griffin.*
*See Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081
(1961).

The *Griffin* Court cited both *Agnello v. United States,*
*supra,* and *Johnson v. United States, supra,* in support of its
holding. To be sure, both cases mentioned a search incident
to an arrest as an exception to the prohibition against war-
rantless searches of dwelling houses, *Agnello,* 269 U.S. at 31,
46 S.Ct. at 6, 70 L.Ed. at 148; *Johnson,* 333 U.S. at 16–17, 68
S.Ct. at 370, 92 L.Ed.' at 442. The issue of a search incident to
arrest was not presented in either case, however. While it
could have been presented in *Agnello,* as the petitioner points
out, the warrantless arrest and search that precipitated the
warrantless search of Agnello's home was not questioned.
The police, acting on probable cause to believe that a violation
of the drug laws was being committed, entered the home of
one of the defendants and arrested among others, Agnello.
269 U.S. at 29, 46 S.Ct. at 5, 70 L.Ed. at 147. They then went
to Agnello's house and searched it without getting a warrant.
The warrantless search of Agnello's home, which was the focus
of the *Agnello* case, was specifically held to be unlawful. 269
U.S. at 31, 46 S.Ct. at 6, 70 L.Ed. at 148. Thus, in addition to
not standing for the proposition for which they were cited,
*Agnello* and *Johnson,* as well as *Griffin,* predate the decision
in *Payton.*

It may well be that the mere observation of the commission
of a crime may provide its own exigency. Important to the
determination of whether that is the case with a particular
crime are such things as the nature of the offense, its serious-
ness and the ease with which the evidence can be disposed of.
Where, however, the police observe the violation of the law,
here, possession and perhaps manufacture, of marijuana, but
do not observe the perpetrator actively so engaged, a different
analysis obtains. Here, to be sure, a violation of the law was
observed. But, although they saw the petitioner return home
and saw her in the premises, they neither saw her plant,
cultivate or otherwise tend to the plants. While by virtue of
her presence, there was probable cause to believe that the

petitioner was committing the crime of, at the least, possession of marijuana, there was no direct observation of her doing so. Under these circumstances, where there is no knowledge on the part of the defendant of the police investigation, there simply are no exigent circumstances permitting the police to forego the obligation of obtaining a warrant.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR QUEEN ANNE'S COUNTY AND TO REMAND THE CASE TO THAT COURT FOR A NEW TRIAL. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY QUEEN ANNE'S COUNTY.