**REPORTED**

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1325

September Term, 2013

---

JOSHUA P. BREWER, JR.

v.

STATE OF MARYLAND

---

Krauser, C.J.,
Zarnoch,
Raker, Irma S.
  (Retired, Specially Assigned),

JJ.

---

Opinion by Zarnoch, J.

---

Filed: October 29, 2014

The facts of this case invite us to revisit the doctrines of "plain view" and "open view" in the context of a warrantless seizure of drugs in the vestibule of a Baltimore City rowhouse.

Appellant Joshua P. Brewer, Jr. was charged in the Circuit Court for Baltimore City with possession of cocaine with intent to distribute and possession of heroin with intent to distribute. On May 14, 2013, the trial court denied appellant's pre-trial motion to suppress, and two days later the jury convicted him of both distribution offenses. After denying appellant's motion for new trial, the court, on July 31, 2013, imposed two concurrent 20-year sentences. In this Court, appellant presents the following questions:

1. Did the trial court err in denying the motion to suppress?

2. Did the trial court err in denying Appellant's motion *in limine* to exclude his prior convictions and/or in denying Appellant's motion for new trial because of the admission of his prior convictions?

3. Did the trial court err in denying the motion for a new trial due to the prosecutor's improper closing argument?

For reasons discussed below, we answer each of these questions in the negative and affirm.

## BACKGROUND

Detective Vincent Lash, narcotics investigator for the Baltimore City Police Department, testified that during the early evening of November 5, 2011, he was on plain clothes duty with two other officers in the vicinity of 14 North Gilmor Street in Baltimore City. Upon receipt of a confidential report regarding suspected drug activity by a certain individual, he covertly observed appellant engaged in suspected drug sales. With binoculars, Detective Lash observed appellant running back and forth from and in and out of the residence at 14 North Gilmor and out across the street where individuals were waiting.

Appellant handed small items in exchange for cash to a total of at least 14 people. Based on Detective Lash's expertise as a drug investigator, after observing these acts he believed that narcotic sales were taking place.

Detective Lash and two colleagues entered the block to arrest appellant, who looked up as he saw them approaching. Appellant then dropped some small objects to the ground and proceeded to stomp upon them. However, his feet missed a red-topped vial of cocaine. The officers arrested appellant and recovered the red-topped vial, but could not recover the gel caps that appellant had stepped upon.

Detective Lash testified that he then walked over to 14 North Gilmor Street, where the clear storm door was unlocked, open and ajar. He approached the door of the property by walking up a stoop of four steps. Looking through the glass storm door from outside, Detective Lash could see a large amount of drugs on top of a ledge above the interior door. By going through the unlocked, open storm door, he entered this part of the building and recovered the drugs.

At the time he entered this area, Detective Lash was unaware of whether it was part of an apartment building or a single family residence. However, he believed it to be open to the public because the exterior door was "just an open storm door," and there was no working doorbell, so anyone who wished to knock on the main front door would have to pass through the storm door and enter the area where the front door was located. Detective Lash testified:

> I went to the location I saw him come out of. At that point, I didn't
> know if it was a - an apartment building, because it's a three story. I didn't

2

know if the drugs - if we were going to have to seize the location and get a warrant.

But from walking up to the location, I could see that it was an exterior door in a vestibule area.[1]  And that's why – and when I saw . . . the drugs, that['s] when I received the drugs – obtained the drugs.

Detective Lash then knocked on the main front door, spoke with appellant's father, Joshua Brewer, Sr., who confirmed that appellant lived there.  Detective Lash informed the father that his son was being arrested.[2]

During his testimony, appellant's father confirmed that anyone wishing to knock on "the main door, the only door" would have to pass through the open storm door into the vestibule area to do so. There was no working doorbell, and mail deliveries were simply tossed into the vestibule area. The solid main door was the one that he  "locked at night . . . that was the real door." Anyone could enter or toss deliveries into the vestibule area without knocking on the screen door.  Photographs of the vestibule introduced as exhibits at the

---

[1]Whether the area in front of the main front door would technically qualify as a "vestibule," or the "first threshold of the building," William E. Ringel, *Searches and Seizures, Arrests and Confessions* (2d Ed. 2014) at § 8:16, we will generally employ the Detective's and the circuit court's terminology.

[2]Responding to a question about why he declined to arrest the drug purchasers on the street, Detective Lash testified:

> If I get these individuals, Mr. Brewer would take his drugs and go inside or run away.  If I lock up one person a block away, he - - it - - word will travel in the city: Lookout, information, "Hey, they just - - Jimmy you just sold to just got locked up from police."  So for me to get Mr. Brewer, I have to let small fish go to get big fish.

suppression hearing displayed a short, narrow, uncarpeted corridor with no objects on the floor or walls. The corridor led to a door with double locks topped by a paladian window. The interior door sat on a raised step.

Appellant also testified that the storm door was not locked. When asked whether unexpected visitors would simply open the storm door and enter the vestibule, appellant answered: "If they wanted to, of course they could. It's not locked."

At the suppression hearing, the appellant contended that the vestibule was part of the curtilage, a protected area. The prosecution argued that it was not curtilage. The trial judge denied appellant's motion to suppress the recovered drugs ruling as follows:

> I have listened to the testimony of all the parties involved. And I find the testimony of Detective Lash to be credible about what happened, specifically that he had gotten information from a CI that a person matching the defendant's description was selling drugs like crazy in the area of 14 North Gilmor Street, right where we're talking about.
>
> The officers were able, with their binoculars, to observe similar activity to that, someone, what Detective Lash referred to as "serving customers" approaching people and taking money and giving small objects sufficient that they felt they had corroborated the CI sufficient that they rolled quickly up to the scene with the intention of arresting the defendant.
>
> Even before they got out of the car, the defendant dropped whatever was in his hand and danced upon those items, missing only one of them, a red-top vial. The Detective Lash saw that and then went to the place where he had seen the defendant come.
>
> Now, there are three different areas here. We have the stoop, as this is Baltimore City. We have what is referred to as the "vestibule." And I think it is truly a vestibule. And we have the interior of the house.
>
> No one contends that the police did not have the legal right to go up on

4

the stoop. Everybody who comes, even the defendant said that Jehovah's Witnesses go up on the stoop and bang on the door. Everybody has that right.

What is the legal significance of the vestibule. And I think that it is acceptable to include that in the – in the concept of curtilage. And then the interior door, which is the defendant's father said was open a little bit, the detective said was closed, is the demarcation of the private area of the home.

Those are our three spots; stoop, public area, vestibule, curtilage. The area beyond the interior door is private area.

The Fourth Amendment looks at all of those areas quite differently. As to the stoop, if anyone can go there, so can a police officer. As to the curtilage, that is an area protected by the Fourth Amendment unless what is in the curtilage is observable from the public area.

Just as if I happen to have a marijuana plant growing on my patio, my patio is protected area, but looking at my marijuana plant growing on my patio might be something that could be seen from the front street or the alley behind my home, an area where the police have a right to be.

So this entire analysis comes down to whether Detective Lash, upon going up to the steps, could in fact see a bag atop the door in what used to be a transom area above the front door.

It is his testimony he saw it from that distance which he would be looking through a glass panel or crack in the door – I think there is no significance between either looking through the glass panel or any crack in the door – seems to be maybe five or six feet away by the pictures.

He looked in. He saw it, he recognized it as the same thing that the CI had been talking about that he had seen on the street dropped by the defendant and missed in his stomping; that when he sees it, he recognizes it as evidence.

I think here we are clearly in the Plain View Doctrine. The police officer has a right to be where he is, sees something he recognizes as evidence, and we should also point out that this is a – an exigent circumstance to this extent. If a warrant is needed for the vestibule, then the items in the vestibule could be moved or disposed of by anyone inside the house.

5

If the vestibule is not covered by the Fourth Amendment protections in need of a search warrant, the officer can go in and take it.

When he sees it, given the exigency, I believe he is allowed to go in and pick it up and seize it only. They did not proceed further with a warrant to search the rest of the house. Rather they arrested the defendant and recovered the drug on the street, the bag from the transom. And I find that to be in plain view and within the rights of the police to seize upon seeing it. . . . The motion to suppress the drugs is denied.

## DISCUSSION

**I.    Trial court's denial of motion to suppress**

**A.    Introduction - Standard of Review**

Appellant's first argument is based upon the Fourth Amendment's protection against unreasonable searches and seizures. He contends that the circuit court erred by failing to grant his motion to suppress the seized drugs because Detective Lash lacked permission, failed to obtain a warrant, and no exigency existed for him to search the curtilage area of his home. Appellant contends that, under established constitutional law, it cannot reasonably be disputed that by opening the storm door, entering the vestibule and seizing a bag from its interior, Detective Lash conducted "an unreasonable search." Maintaining that the circuit court properly denied the motion to suppress, the State argues that even if the search area is considered curtilage, it is afforded limited Fourth Amendment protection, and the officer had an implied invitation to enter the vestibule.

In reviewing a trial court's denial of a motion to suppress evidence, we base our decision solely upon the "facts and information contained in the record of the suppression

6

hearing." *Longshore v. State,* 399 Md. 486, 498 (2007). We then extend great deference to the suppression judge with respect to the determination and weighing of first-level findings of facts, which we will not disturb unless clearly erroneous, and we view all facts in the light most favorable to the State as the prevailing party. *Williamson v. State,* 413 Md. 521, 531-32 (2010). We also apply a *de novo* standard of review, making our "own independent constitutional apprisal by reviewing the law and applying it to the facts of the case." *Bailey v. State,* 412 Md. 349, 362 (2010) (Citations omitted), *Grymes v. State,* 202 Md. App. 70, 80 (2010).

A defendant "invoking Fourth Amendment protection bears the burden of demonstrating his or her legitimate expectation of privacy in the place search or items seized." *Williamson,* 413 Md. at 534. Also relevant under more recent Supreme Court rulings is whether the government has physically intruded on a constitutionally protected area. *Florida v. Jardines,* ____ U.S. ____, 133 S. Ct. 1409, 1414 (2013).

**B.      Plain view v. Open view**

At the outset, we note that the circuit court's suppression decision appears to have blurred two very different 4th Amendment doctrines: plain view and open view. In *Brown v. State*, 15 Md. App. 584 (1972), Judge Moylan wisely drew critical distinctions between these concepts. Police may seize evidence in plain view without a warrant if "there has been a prior valid intrusion." *Id*. at 604. However, the open view doctrine often contemplates a "pre-intrusion visual observation" of evidence located inside a constitutionally protected area

from a "vantage point outside" the constitutionally protected area. *Id*. at 605. "[T]he valid visual observation simply furnishes probable cause for 1) the issuance of a warrant; or 2) the warrantless entry of the [premises], provided exigent circumstances are also present; or 3) the warrantless entry to effect an arrest for a crime being committed in the officer's presence." *Id*. (Citations omitted). "As a non-search, the visual observation itself is legitimate; but it may never, standing alone, justify an intrusion." *Id.*

If the vestibule was curtilage and a constitutionally protected area, as the circuit judge indicated, and the detective observed the drugs in a pre-intrusion setting from outside that protected area, he would have seen the drugs in open view, not in plain view after a prior valid intrusion. Under these circumstances, a warrantless entry into the vestibule would have to be justified by exigent circumstances.

## C. Open View / Exigent Circumstances

Under the open view doctrine, there was nothing impermissible about Detective Lash's observation of the drugs through the glass door while standing on the stoop of appellant's residence; and the suppression court specifically found that Detective Lash's seizure of the drugs was justified by exigent circumstances. The circuit judge noted that "[i]f a warrant is needed for the vestibule, then the items in the vestibule could be moved or disposed of by anyone inside the house" and "[w]hen he sees it, given the exigency, I believe he is allowed to go in and pick it up and seize it. . . ." We agree with the circuit court.

This Court has said that "drugs are peculiarly susceptible to quick destruction."

8

*Archie v. State*, 161 Md. App. 226, 243 (2005). No greater illustration of that fact occurred when appellant, right in front of the officers, stomped drugs he was selling on the street. Although appellant was arrested and cuffed and could not destroy drugs inside the house, Detective Lash had no assurance that any person inside the house might not move or, like appellant, destroy the drugs if he stopped to obtain a warrant. Moreover, an open glass door was the only protection that evidence would receive from the drug purchasers and others outside, who undoubtedly knew that appellant was obtaining the drugs from inside the home.[3]

This is not a case like *Dunnuck v. State*, 367 Md. 198 (2001), where the police through their own delay created the exigency needed to justify a warrantless entry of a residence. Here, the police had witnessed a drug offense, the destruction of some of the evidence in their very presence and the obvious use of the residence to store the drugs being sold. Under these circumstances, it would have been astonishing if the detective did not knock on the door of the premises and seize the drugs that were before him. In our view, the State met its burden of showing exigent circumstances for seizing the drugs in the vestibule even if it is considered part of the curtilage.

In his reply brief, appellant for the first time relies on *Jardines* to argue that Detective Lash intruded upon a "constitutionally protected area" by "opening the door and entering the vestibule and seizing a bag from the interior." *Jardines* involved police use of a drug-

---

[3]Detective Lash testified how quickly word traveled on the street when a drug arrest had occurred.

sniffing dog on the front porch of a residence to investigate an unverified tip that marijuana was being grown on the premises. It did not involve an ordinary visual observation of drugs, in open view, made from a place where anyone had a right to be, and a seizure based on exigent circumstances.

On the basis of *Jardines*, appellant contends that Detective Lash did not have an implied license to enter the vestibule to knock on the internal door of the residence. *See Brown v. State*, 75 Md. App. 22, 23 (1988). *Jardines* could be seen as modifying an "implied license" for a police officer to invade the curtilage to conduct a dog-sniffing search. There, the majority observed generally that "the background social norms that invite a visitor to the front door do not invite him there to conduct a search," 133 S.Ct. at 1416, and more specifically, that "[a]n invitation to engage in canine forensic investigation assuredly does not inhere in the very fact of hanging a knocker." *Id.* Nevertheless, the majority still noted that "a police officer not armed with a warrant may approach a home and knock, precisely because that is no more than any private citizen may do." *Id.* In short, we believe *Jardines* does not require the forfeiture of Detective Lash's license to enter the vestibule to knock on the internal door. *See State of Idaho v. Howard*, 315 P.3d 854, 859 (2013).

### D. Curtilage

Because of our conclusion that the observation of the drugs was not a search and any seizure was justified by exigent circumstances, we need not definitively determine the correctness of the circuit court's suggestion that the vestibule was curtilage. We do note

10

however, that terming a particular area curtilage "expresses a conclusion; it does not advance Fourth Amendment analysis." *U.S. v. Arboleda*, 633 F.2d 985, 992 (2d Cir. 1980). The circuit court here did not employ the four analytical tools approved by the U.S. Supreme Court in *U.S. v. Dunn*, 480 U.S. 294 (1987) to determine whether the vestibule harbors the intimate activity associated with the sanctity of a person's home and the privacies of life. *Id*. at 300. Those factors are: 1) the proximity of the area claimed to be curtilage to the house; 2) whether the area is included within an enclosure surrounding the house; 3) the nature of the uses to which the area is put; and 4) the steps taken by the resident to protect the area from observation by people passing by. *Id*. at 301.

In *U.S. v. Cooke*, 674 F.3d 491 (5th Cir. 2012), *cert. denied,* _____ U.S. _____, 133 S.Ct. 756 (2012), the U.S. Court of Appeals for the Fifth Circuit applied these factors to the area between the exterior and interior doors of the defendant's barn-like residence and concluded that the area was not within the curtilage of the home, noting that "any member of the public would reasonably think that they would have to enter and knock on the interior doors when visiting." *Id*. at 495.

As in *Cooke*, the first two *Dunn* factors favor appellant. The vestibule was physically attached to and shared the same roof as the residence. However, focusing on the latter factors, we note that the area between the glass storm door and the interior door was a narrow, non-descript, unadorned corridor devoid of the intimate activity associated with the sanctity of a person's home and the privacies of life. The external door with no doorbell was

11

ajar, a see-through, deliberately open to the world at large, and leading to what the public would readily believe is the real door - - double-locked, on a step with a palladian window. Arguably, there would be no reasonable expectation of privacy in such an area. And the testimony in the case confirmed this description. If the area beyond the storm door was not curtilage, but an extension of the stoop, it would not be a constitutionally protected area. As a result, police entry would be a non-search and taking the drugs into custody would not raise a Fourth Amendment issue. *See Fitzgerald v. State*, 384 Md. 484, 503-04 (2004); *Brown*, 15 Md. App. at 605. Nevertheless, this is an issue we need not decide today.

## II.     Trial court's denial of motions regarding evidence of prior convictions.

During trial, prior to advising appellant of his right to testify, defense counsel moved to exclude evidence of appellant's 2004 and 2006 drug distribution convictions that the State indicated it intended to introduce for impeachment purposes.[4] While the trial court was balancing probative value versus potential prejudice of these two convictions, defense counsel expressed concern that, given their similarity to the current charges, the jury "would not be able to separate and might assume that because he was convicted in the past he must be guilty this time." The trial court denied the motion, explaining as follows:

> THE COURT:     Well, I understand that. But obviously if the State does not go into this and defendant testifies, when he presents, without other comment, as a person with no criminal record.

---

[4]Appellant had also been convicted of possession with intent to distribute (the same crime for which he was on trial) in 1999, and for a handgun offense, but the State did not plan to introduce these convictions.

When we have a specialist here who has three actual convictions for drug felonies, the fact that he got arrested for another drug felony shouldn't allow him to keep his speciality out of consideration. And – and let him come in cloaked in the – the garb of someone who's never been convicted.

You know, if he had a robbery, and he had a theft, and he had a burglary, and he had drugs, then I could exclude the drugs because it wouldn't be giving a false impression about the man.

But in this case, this is his speciality. And these three felony convictions are very substantial. They are the type of crime that the Court of Appeals and the Court of Special Appeals have specifically recognized as impeachable offenses.

The only reason to exclude them is because it's the same offense. But then as to each criminal, we would be saying specialize, and no one would ever know about your history. So I'm going to deny the motion to suppress those items.

When defense counsel argued that "that's precisely why they shouldn't come in because the jury might conclude that he was a specialist," the court responded that if the evidence comes in, he would "give them the instruction that this is not for the purpose of – of deciding whether he would have committed the offense as he had in the past, but rather it is part of assessing his credibility, something they'll have to do."

Understanding that these prior convictions would be coming in as evidence if he took the stand, appellant still chose to testify. During his direct testimony, appellant confirmed that in 2000 and 2006 he was convicted of possession with manufacturing and distribution of heroin, and that in 2004 he was also convicted of heroin distribution. During cross-examination, the prosecutor asked the following question:

Now, your attorney asked you about your prior convictions. In 2006 – let's

13

just clarify. In 2006 you were convicted of distribution of heroin, and conspiracy to distribute heroin; isn't that correct?

Appellant answered in the affirmative.

Subsequent to trial, appellant unsuccessfully moved for new trial on the basis that it was reversible error to have denied his motion to exclude evidence of the prior convictions. In its ruling, after pointing out that appellant's other prior acts were being excluded, the court concluded that it had properly conducted the balancing, and that under the circumstances appellant was appropriately confronted with his history "in the course of a story that the jury did not believe." Although appellant's charges were similar to his past convictions, the judge explained that there was no reason a defendant experienced with a particular crime "should be allowed to present himself to the jury on the credibility question as a law abiding citizen."

Appellant now argues that reversal is required, contending that the probative value of his prior convictions was outweighed by their unfair prejudice, so the trial court abused its discretion by denying his motion *in limine* and/or in denying his motion for new trial. He argues that the prior convictions, which were unrelated to the accusations at hand, "added very little to the State's case while engendering grave prejudice to Appellant" by tarnishing him as a "specialist" and showing criminal propensity. He contends that impeachment with prior convictions very similar to the charges on trial created a grave danger that the jury convicted on the basis of an inferred propensity to commit the crime, and not on the basis of the evidence. The State maintains that the trial court acted well within its discretion in denying each of appellant's motions. Credibility was a central issue in the case, and its

14

resolution "boiled down to whether the jury believed the testimony of the police officers or the contradictory testimony" of appellant.

Maryland Rule 5-609 governs admissibility of prior convictions for the purpose of impeaching a witness's credibility. This rule provides, in relevant part:

> [E]vidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record during examination of the witness, but only if (1) the crime was an infamous crime or other crime relevant to the witness's credibility and (2) the court determines that the probative value of admitting this evidence outweighs the danger of unfair prejudice to the witness or the objecting party.

Md. Rule 5-609(a). In addition, the conviction must be no more than 15 years old, and cannot have been reversed, vacated, pardoned, or be currently on appeal. Rule 5-609(b)-(c). Maryland law is clear that a trial court may properly admit evidence of a defendant's prior conviction for distribution of controlled dangerous substances for the limited purpose of impeaching his credibility. *State v. Giddens,* 335 Md. 205, 217 (1994) (Conviction for cocaine distribution is relevant to credibility, as such an offense reveals that an individual "would be willing to lie under oath"). In *State v. Woodland,* 337 Md. 519 (1995), the Court ruled that the defense witness' prior conviction for possession with intent to distribute was similarly admissible for impeachment purposes, as long as the trial judge conducts the proper balancing test.

Where the trial court's decision reflects an exercise of the discretion vested under Rule 5-609, it is well established that the balancing of the probative value of a prior conviction against its prejudicial effect is a matter left to the court's sound discretion.

15

*Jackson v. State,* 340 Md. 705, 719 (1995); *Giddens,* 335 Md. at 213. When the trial court exercises its discretion in these matters, we "will give great deference to the court's opinion" and appellate courts "will not disturb that discretion unless it is clearly abused." *Jackson,* 340 Md. at 719. Similarly, the court's decision as to whether to grant a new trial lies within the sound discretion of the trial court and its decision will not be disturbed on appeal absent an abuse of discretion. *Argyrou v. State,* 349 Md. 587, 600 (1998).

The Court of Appeals has identified five factors that judges may consider when weighing the probative value of a prior conviction against its prejudicial effect, which "should not be considered mechanically or exclusively," but should be treated as a "useful aid to trial courts in performing the balancing exercise" established by Rule 5-609. *Jackson,* 340 Md. at 717.

> These factors are (1) the impeachment value of the prior crime; (2) the point in time of the conviction and the defendant's subsequent history; (3) the similarity between the past crime and the charged crime; (4) the importance of the defendant's testimony; and (5) the centrality of the defendant's credibility.

*Id.* "Where credibility is the central issue, the probative value of the impeachment is great, and thus weighs heavily against the danger of *unfair* prejudice." *Id.* at 721 (emphasis in original). Similarity between the past and current offenses weighs against admission, but does not serve to automatically exclude such evidence. For example, we concluded that the trial court did not abuse its discretion in admitting evidence of two prior armed robbery convictions to impeach a defendant who was being tried for the same offense. *Facon v. State,* 144 Md. App. 1, 47 (2002), *rev'd on other grounds,* 375 Md. 435 (2003).

16

In a case with a fact pattern similar to the one before us, the defendant was charged, *inter alia,* with possession with intent to distribute heroin and cocaine. *Summers v. State,* 152 Md. App. 362, 366-67 (2003). Prior to trial, the defense unsuccessfully moved *in limine* to exclude Summers' one year-old conviction for possession of a controlled dangerous substance with intent to distribute. *Id.* at 368-69. While balancing the factors enumerated in *Jackson,* the trial court reasoned that weighing against admissibility was the recent nature of prior convictions and their similarity to the charged offenses. *Id.* at 369. On the other hand, witness credibility was central to the case and "the jury's verdict would depend on whether it believed appellant or the police officers." *Id.* at 371. The court concluded that permitting the defendant to portray the "stellar picture of himself" to the jury as someone without a criminal background, the probative value of admitting the evidence outweighed the danger of unfair prejudice. *Id.* at 369, 372, *Jackson,* 340 Md. at 721. We affirmed the court's decision, concluding that the trial court properly exercised its discretion.

Similarly here, the trial court, to the extent the convictions were admitted for impeachment purposes, would not have abused its discretion by denying appellant's motion to exclude. First, his prior convictions were for drug distribution, which are impeachable offenses pursuant to Rule 5-609. Unlike *Summers,* in which the prior conviction was very recent, appellant's 2004 and 2006 convictions are somewhat older. Moreover, appellant's prior convictions were for heroin distribution, whereas he was being tried for possession with intent to distribute, so the prior convictions were similar but not identical. Because

17

appellant's testimony directly contradicted the State witnesses' version of events, credibility was an issue in the case. A plausible reading of the circuit court's oral opinion on the motion to exclude indicates that it was allowing the convictions to be admitted principally for impeachment purposes and not to show criminal propensity. The court's erroneous and unnecessary references that appellant was a "specialist" and that drug dealing was his "specialty," do not undermine the court's express determination that the prior convictions were "impeachable offenses" to be used by the jury in "assessing [appellant's] credibility." The jury was also specifically instructed to that effect. In any event, it is our view that any erroneous admission of this evidence was harmless beyond a reasonable doubt. Appellant was caught red-handed dealing drugs. His offenses were witnessed by the police. He destroyed evidence in their presence. And drugs were recovered from the vestibule of his home. Thus, admission of evidence of his prior convictions could not have made a difference in the correct determination of his guilt. As a result, appellant's motion for a new trial was properly denied.

**III.    Motion for new trial regarding prosecutor's comment during closing.**

Appellant's final contention is that the trial court abused its discretion by failing to grant his motion for a new trial due to comment by the prosecutor during closing, which inappropriately argued that appellant was "experienced" in selling drugs, given that he had been twice before convicted for the "exact same thing." Appellant contends that the prosecutor's remark "clearly sought to unfairly prejudice the jury" against him, violating his

18

right to a fair trial, and despite the trial court's attempt to instruct the jury otherwise, "the proverbial bell had rung, and it could not be 'un-rung.'" Maintaining that the trial court properly exercised its discretion by denying appellant's motion for new trial, the State points out that not only did the prosecutor quickly correct her improper remark, but the trial court issued a curative instruction, which together ensured that the jury would consider appellant's prior convictions for impeachment purposes only. Furthermore, evidence against appellant was overwhelming, so any possible error by the trial court based on the "slight misstatement by the prosecutor" was harmless beyond a reasonable doubt.

During the State's closing argument in the case before us, the following colloquy took place:

> [PROSECUTOR]: Defendant knew what he was doing. He knew what he was had in his possession. He knew he had cocaine. He knew he had heroin.
>
> He's well experienced in selling drugs. Why? Because he's been not once, but twice convicted of the exact same thing –
>
> [DEF COUNSEL]: Your Honor, may we approach?
>
> THE COURT: No, I'll sustain the objection.
>
> And I'll admonish you, ladies and gentlemen, you cannot use that, the prior convictions for any purpose other than deciding whether or not the defendant was telling you the truth when he testified. It has nothing to do with – with any of the elements of the crime.
>
> Please proceed.
>
> [PROSECUTOR]: Thank you.
>
> By his own testimony he was twice convicted of distribution, 2004

19

distribution, 2006 distribution and conspiracy to distribute.

In light of those convictions, you need to take his credibility into account, especially when he's giving inconsistent testimony, directly inconsistent with his father's testimony of him – of the dad calling out to him and the dad saying he never called out to him, never looked out the window that evening.

The defendant knew what he was doing that day. . . .

In denying appellant's motion for new trial on the grounds that the prosecutor's remark was improper, the trial court ruled as follows:

THE COURT:    As to the blurt-out by [the prosecutor] that the defendant was a convicted drug dealer, I think I took the exact corrective action which was called for under the circumstances, told the jury to completely disregard that. And, if anything, the whole circumstance was a distraction or embarrassment for [the prosecutor's] presentation but not one that would lend the jury to come to the conclusion it did.

I think what . . . led the jury to the conclusion it came to was the strength of the State's case and the $403 in the defendant's pockets and the drugs that were recovered, 40 vials of cocaine and 27 gel caps of heroin.

It is a movant who holds the burden of persuading the court that a new trial should be granted. Whether to grant a new trial lies within the sound discretion of the trial court, whose decision will not be disturbed on appeal absent an abuse of discretion. *Argyrou,* 349 Md. at 600. The abuse of discretion standard requires trial judges to use their discretion soundly, and we do not consider that discretion to be abused unless "the judge 'exercises it in an arbitrary or capricious manner or when he or she acts beyond the letter or reason of the law.'" *Washington v. State,* 424 Md. 632, 667-68 (2012) (quoting *Campbell v. State,* 373 Md. 637, 665-66 (2003)). A trial court's discretion to grant or deny a new trial expands and

20

contracts, depending upon the nature of the factors being considered, and its exercise "depends upon the opportunity the trial judge had to feel the pulse of the trial, and to rely on his or her own impressions in determining questions of fairness and justice." *Argyou,* 349 Md. at 600, *Washington,* 424 Md. at 668.

In conducting closing argument, "the prosecutor is allowed liberal freedom of speech and may make any comment that is warranted by the evidence or inferences reasonably drawn therefrom." *Lee v. State,* 405 Md. 148, 163 (2008). "Despite the wide latitude afforded attorneys in closing arguments, there are limits in place to protect a defendant's right to a fair trial." *Degren v. State,* 352 Md. 400, 430 (1999), *Lee* at 163. When reviewing a decision based on an improper remark in the prosecutor's closing argument, unless it appears that the jury was actually misled or were likely to have been misled or influenced to the prejudice of the accused by the remarks of the State's Attorney, reversal of a judgment will not be justified. *Holbrook v. State,* 6 Md. App. 265, 270 (1969). Reversal is only required if prosecutor's improper comment actually misled the jury or was likely to have influenced the jury to the prejudice of defendant. *Degren,* 352 Md. at 431. The "determination of whether the prosecutor's comments were prejudicial or simply rhetorical flourish lies within the sound discretion of the trial court." *Id.*

A significant factor in determining whether a defendant was likely to be prejudiced by an improper remark is whether the trial court took appropriate action to overcome the likelihood of prejudice, such as informing the jury that the remark was improper, striking it

21

and admonishing them to disregard it. *Holbrook,* 6 Md. App. at 270. In concluding whether a particular remark is harmless, appellate courts may review various factors, including the severity of the remark, the measures taken to cure any potential prejudice, and the overall weight of the evidence against the accused. *Lee,* 405 Md. 174-75. In this case, the prosecutor's remark merely referred in passing to a fact to which appellant himself had testified. Indeed, whereas the prosecutor referred to two prior convictions, appellant himself testified to having three prior prosecutions for dealing drugs. When defense counsel asked to approach the bench, the trial court took affirmative action by issuing a curative instruction to the jury. The prosecutor then corrected her closing argument by attempting to make it clear that her reference to prior convictions was for the purpose of questioning appellant's credibility as a witness. Overall, her comment itself was slight, the weight of the State's evidence was strong, and corrective actions were taken by both the trial court and the State. As a result, the court properly denied appellant's motion for new trial.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**