REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 660

September Term, 2014

_____

GEORGE JOHNSON

v.

STATE OF MARYLAND

_____

Graeff,
Leahy,
Thieme, Raymond G., Jr.
          (Retired, Specially Assigned)

JJ.

_____

Opinion by Leahy, J.

_____

Filed: June 28, 2016

George Johnson, ("Appellant"), and Derrick Toomer were charged and tried separately for the contract killing of bail bondsman Ralph Hall. Mr. Hall was found early in the morning on July 30, 2008, lying dead from gunshot wounds in the parking lot of KIPP Harmony Academy, a public charter elementary school located in Baltimore City.

Appellant was tried before a jury in the Circuit Court for Baltimore City after his codefendant Toomer had been convicted of murder. The State attempted to present Toomer as a witness against Appellant, but when called before the jury to testify, Toomer refused to answer questions and invoked his Fifth Amendment privilege against self-incrimination. Acting swiftly, the circuit court halted questioning and excused the jury before examining the merits of Toomer's assertion of privilege. The circuit court did not compel Toomer's testimony.

After the jury convicted Appellant of Mr. Hall's murder, Appellant filed a motion for a new trial arguing, *inter alia*, that the State called Toomer for the impermissible purpose of using Toomer's reliance on the Fifth Amendment privilege before the jury to imply Appellant's guilt. Toomer maintained that the State had been made aware that he would not testify. The court, however, rejected Appellant's contentions of error and denied his motion for a new trial. Appellant asks this Court to examine:

I. Whether Appellant was denied his right to a fair trial, in violation of the Due Process Clauses of the Fifth and Fourteenth Amendments, when the prosecution called his separately tried and convicted codefendant as a witness in its case in chief with full knowledge that the witness would invoke a valid Fifth Amendment privilege and refuse to testify?

1

II.   Whether the trial court erred in denying appellant's motion for new trial when the prosecution,

   a. Improperly called appellant's separately tried and convicted codefendant as a witness with full knowledge that the witness would invoke his Fifth Amendment privilege and refuse to testify;

   b. Committed a *Brady* violation by failing to disclose impeachment information relating to a critical prosecution witness;

   c. Improperly displayed a firearm to the jury, which was not admitted into evidence or forensically linked to crime, in support of its closing argument asserting that the firearm was, in fact, the murder weapon used by appellant?

Applying the factors enumerated in *Vandegrift v. State*, 237 Md. 305, 309-10 (1965), we conclude Appellant was not prejudiced by codefendant Toomer's brief appearance before the jury because (1) the prosecutor did not call Toomer solely to gain the benefit of "the effect of the claim of privilege on the jury"; (2) the circuit court minimized any negative effects of Toomer's refusal to testify when it halted questioning expeditiously and excused the jury; and (3) during the course of the trial Appellant never requested any curative instruction nor did he move for a mistrial.  Regarding the other issues Appellant presented in his motion for a new trial, we perceive no error or abuse of discretion on the part of the circuit court and conclude that Appellant was not denied his right to a fair trial.

## BACKGROUND

On July 15, 2011, a grand jury indicted Appellant for Mr. Hall's murder on the charges of: murder in the first degree; use of a handgun in the commission of a crime of

violence; wearing, carrying, and transporting a handgun upon his person; and possession of a handgun after being convicted of a disqualifying crime. The grand jury also indicted Appellant of conspiring with codefendant Derrick Toomer to commit Mr. Hall's murder. Appellant's case was severed from Derrick Toomer's on March 11, 2013, and Appellant's first trial commenced on March 22, 2013, in the Baltimore City Circuit Court. Appellant moved for a mistrial in that proceeding, and the court granted the motion on April 1, 2013.

Appellant's second trial began on March 18, 2014. The following events transpired as the story unfolded over the six-day trial.

### A.     The Testimony of Hall's Fiancé

The State presented as its first witness, Ms. Faaizah Seals, who was Mr. Hall's fiancé at the time of his death. She testified that she and Mr. Hall were co-owners of Muscles Bail Bonds. Ms. Seals related that Muscles Bail Bonds was seeking a new insurer following the 2008 departure of another employee who had acted as the company surety insurer under his license as an insurance producer in Maryland.[1] Mr. Hall was looking for another person who was licensed through which Muscles Bail Bonds could be insured.[2]

---

[1]  Under Maryland Rule 4-217(b)(1), a "'Bail bondsman' means an authorized agent of a surety insurer." Pursuant to Maryland Code (1995, 2011 Repl. Vol.) Insurance Article ("Ins.") § 10-304, before a person may provide bail bondsman services, he or she must obtain a license to act as an insurance producer identical to that issued by the Maryland Insurance Commissioner under Ins. § 10-103.

[2] Detective Moran testified that Mr. Hall's bail bonds business was "not legit"

In the early evening hours of July 29, 2008, while Ms. Seals was cooking dinner, Mr. Hall was taking a nap. Mr. Hall's phone rang at approximately 7:00 p.m., so Ms. Seals woke him up to tell him about the call. He listened to the voicemail left by the caller and prepared to leave their home. According to Ms. Seals, "[Mr. Hall] said he was going to meet up with someone named G concerning insurance . . . ." That evening Mr. Hall drove away in a Ford Expedition XL2—a vehicle they both shared and used in their business. After Mr. Hall did not return, Ms. Seals tried to reach him unsuccessfully on his cell phone multiple times throughout the night and, after getting no answer, she also tried a couple of hospitals to no avail. In the morning when she awoke, she found a card under the front door from homicide detective Michael Moran asking her to give him a call.

## B.    Detective Moran

Detective Michael Moran of the Baltimore City Police Department, Homicide Unit, was called to testify regarding his role as the primary investigating officer in this case. He testified that at 6:01 a.m. on July 30, 2008, he responded to a call notifying him that there was a deceased person in the parking lot of KIPP Academy at 4701 Greenspring Avenue. When Det. Moran arrived at the scene he observed "the deceased, Mr. Ralph Hall, face down wearing blue jeans[ and] a red polo," and he noted that a medical technician had already pronounced Mr. Hall dead. Det. Moran also testified that, when he arrived, "[Mr. Hall] had on a pair of white tennis shoes that said Muscles on them [, and] [h]e was stiff."

because he was not licensed and did not have the requisite insurance.

Det. Moran oversaw the collection of crime scene evidence, including photographs, measurements, and other physical evidence. Under his supervision, Baltimore City Crime Lab technicians processed the scene; however, no weapon or bullet casings were recovered. Det. Moran testified that he was also present at the autopsy of Mr. Hall, and that the Assistant Medical Examiner who conducted the autopsy recovered two projectiles from Mr. Hall's body and submitted them for ballistic analysis. Baltimore City Firearms Examiner Christopher Faber later determined that the projectiles were lead bullets of the .38/.357 caliber class.

During his evaluation of the scene, Det. Moran noticed a security camera on a nearby building "up high and . . . facing towards the parking lot where the victim was found." He directed officers to recover the whole security system from KIPP Academy so that the footage from multiple cameras could be downloaded and viewed as part of the investigation.

Det. Moran confirmed that the next day, July 31, Mr. Hall's Ford Expedition was recovered on the 2800 block of Roslyn Avenue, and towed to the crime lab where it was processed as part of the crime scene. Crime lab technicians then collected DNA samples from the vehicle.

### C. The Conspiracy

Detailing his investigation into the homicide, Det. Moran recounted that "[b]ecause Mr. Hall had a badge and the cuffs and he had Muscles written on his shoes, we knew there

5

was Muscles [Bail Bonds] on Bel Air Road." This led the detective to contact Ms. Seals who, according to Det. Moran, was hysterical when he interviewed her. She told him that Mr. Hall received a voicemail and that an individual known as "Credit Card Mike, set this insurance up for his business because Ralph Hall needed his own insurance to start his business with the bail bonds. And that he wanted to meet this guy at 7:30."

In his second interview with Ms. Seals, Det. Moran was informed that Credit Card Mike—now identified as Michael Hayes—believed that Mr. Hall set him up to be robbed earlier in 2008. Det. Moran then interviewed Michael Hayes, who had recently been arrested on a handgun violation. Det. Moran testified that Hayes told him that Derrick Toomer was involved in the murder. Hayes also identified one of the vehicles connected to the murder; and provided police with an address, "806 Tipton," and a hand drawn map to where they could find the vehicle. Upon investigating the address, Det. Moran located and photographed a vehicle matching the vehicle in the security footage recovered from KIPP Academy, and that vehicle was found to be registered under the name "Darrell Toomer."

Det. Moran also testified that, on November 12, 2008, he interviewed James Nelson, who helped him narrow the suspects to Appellant and Derrick Toomer. Nelson identified both Appellant and Derrick Toomer in photographic arrays shown to him by Det. Moran.

On March 21 and 24, the State's principal witness, James Nelson, appeared before the jury in a prison uniform. Nelson testified that he had been incarcerated twice between

6

the time Mr. Hall was killed and Appellant's trial and that he was currently serving a thirteen-year sentence. Nelson testified that Derrick Toomer and Appellant typically drove a burgundy red Crown Victoria. Nelson also testified that he had a conversation with both Derrick Toomer and Appellant in which Appellant admitted to killing Mr. Hall. The following exchange took place:

[THE STATE]: What did [Appellant] tell you about [Mr. Hall]?

[NELSON]: That he got robbed and that Mike paid [Derrick Toomer] for him to be killed.

[THE STATE]: So [Appellant] told you that Mike paid [Derrick Toomer] to have [Mr. Hall] killed?

[NELSON]: Yeah.

[THE STATE]: What else did he tell you?

[NELSON]: That he killed him.

[THE STATE]: Who killed [Mr. Hall]?

[NELSON]: [Appellant].

[THE STATE]: Did he tell you how?

[NELSON]: He shot him in the truck.

[THE STATE]: And did he tell you with what weapon?

[NELSON]: A .38.

[THE STATE]: Are you familiar with any .38's?

[NELSON]: Yeah.

[THE STATE]: He tell you about that?

[NELSON]: We all used to use it.

[THE STATE]: Can you describe the .38 you used?

[NELSON]: Revolver.

[THE STATE]: What color was it?

[NELSON]: Black.

[THE STATE]: And any other color on that gun?

[NELSON]: The handle's brown.

Nelson testified that he and Appellant discussed Mr. Hall's murder "probably eight, nine times[,]" and that Appellant told him that

> Derrick rode him up there to meet [Mr. Hall] and [Appellant] got out the car and walked over to [Mr. Hall's] car -- truck and, you know.

> * * *

> . . . [Appellant] said when he got up there he got out the car, talked to Derrick for a minute. Walked over to [Mr. Hall's] car and talked to him.

> * * *

> [Appellant] said he pulled out the gun and shot him.

> * * *

> [Appellant] said he pulled [Mr. Hall] out the car and drove off in the car.

Additionally, the State introduced a photographic array in which Nelson had identified Derrick Toomer. Nelson read his handwritten statement, made at the time of the photographic array, in open court:

8

The person in the picture is Derrick Toomer. Face, [Appellant], told me that it was easy to kill [Mr. Hall]. When [Appellant] got out the driver's seat of the car Derrick Toomer asked [Appellant] was he sure he could handle the shooting. [Appellant] replied, it's nothing. [Appellant] met [Mr. Hall] and talked to him for a minute and pulled out a .38 and shot him and took his money and necklace and left.

They went back to Nicole's house, [Derrick Toomer's] girlfriend, and split the money up. That's when [Derrick Toomer] called me and we met up, he told me the whole story and that he was waiting for Mike to come over to give him the money for killing [Mr. Hall].

The next day [Derrick Toomer] told me that he went back over to Greenspring[] to see if [Mr. Hall's] body was still there and it was. [Appellant] then bragged that he should have shot [Mr. Hall] in the head for being cruddy for setting Mike to get robbed.

Nelson also testified that he met with officers investigating Mr. Hall's murder prior to entering a plea agreement in his own case. Nelson denied that he was either threatened or promised anything in exchange for his testimony. The State did not disclose that Nelson was also a witness in an unrelated murder trial.

### D. Admission of the .38 Caliber Handgun

On March 21, 2014, the State called Kelly Toomer—codefendant Derrick Toomer's son. Kelly Toomer identified Appellant in the courtroom and testified that he, Appellant, Derrick Toomer, and James Nelson spent time together in 2008.[3]

On direct examination, Kelly Toomer testified that, in 2008, he had a "[f]ew different guns," but he could not recall the calibers of the weapons. However, he also testified to the events surrounding his arrest on August 31, 2008. Kelly Toomer was

---

[3] Witness Kelly Toomer testified that Appellant was known under the nickname "Face," and that James Nelson was known by the nickname "Black."

arrested while seated in the front passenger seat of a Crown Victoria, from which two handguns were recovered by the police. When the State presented him with a revolver, marked as State's Exhibit 20, the following exchange occurred:

[THE STATE]: Mr. Toomer, can you tell the members of the jury what kind of gun this is, if you're able to tell?

[KELLY TOOMER]: My revolver, .38.

* * *

[THE STATE]: You don't remember this being one of the two guns that was in the Crown Vic glove compartment?

[KELLY TOOMER]: No, I had [a] .38. I don't know if that was the gun though.

To assist Kelly Toomer's recollection, the State introduced a portion of a document that Kelly Toomer had identified as his signed plea agreement entered into following his arrest on August 31, 2008. The following portion of the plea agreement was read before the jury:

On August 31, 2008 Kelly and Derrick Toomer were together with James Nelson and [Appellant]. Derrick Toomer handed [Kelly Toomer] a .38 revolver. Both James Nelson and [Appellant] observed this transaction between father and son.

[Kelly Toomer] and [Appellant] then left together in a red Crown Victoria. At approximately 1:30 in the afternoon, [Appellant], who was driving the Crown Victoria, became thirsty and pulled over in the 2300 Block of Biddle Street. He left the car running with Kelly Toomer in the front seat while he went to find something to drink.

At the same time officers were patrolling in the block when an unknown male approached the officer with information that two African-Americans had just robbed someone and that they were both armed with handguns.

10

Officer[s] McCullough and Jones approached the car to further investigate the allegation. They observed [Appellant] exit the vehicle but did not approach until their backup arrive[d].

They approach[ed] the vehicle and s[aw] [Kelly Toomer] in the front seat. The officers also receive[d] information that the car [wa]s not register[ed]. The officers order[ed] a tow truck and conduct[ed] an inventory search pursuant to policy, discovering the .38 handgun in the glove box. All events took place in Baltimore City, Maryland.

Thereafter, the circuit court resolved to admit into evidence the portion of the plea agreement that had been read before the jury, along with the caption on the cover page.[4]

Following Kelly Toomer's testimony, the State called Officer Reginald Jones. Officer Jones testified that he conducted the August 31 search of the Crown Victoria and recovered the .38 revolver from the vehicle. Upon identification by Officer Jones, the "black, snub nose .38 with a brown wooden handle[,]" was admitted into evidence as State's Exhibit 20 without objection from Appellant.

### E.    DNA Evidence

On March 24, 2014, Baltimore City Crime Lab technician Jennifer Ingbretson testified that she compared DNA swabs from both Appellant and Derrick Toomer to DNA swabs collected from the vehicle in which Mr. Hall was killed and from Mr. Hall's clothing. Her analysis identified Appellant as a contributor to a DNA sample collected from the

---

[4] The circuit court also admitted a compact disc containing Kelly Toomer's prior testimony under oath and played the relevant portions for the jury. Kelly Toomer testified to owning both weapons recovered from the Crown Victoria—a .45 and a .38—but indicated that he only used the .45 in the robbery for which he was convicted.

steering wheel. Ms. Ingbretson also testified that Appellant could not be excluded as a contributor to samples taken from "the pockets and adjacent areas of [Mr. Hall's] jeans."

That same day, Baltimore City Firearms Examiner, Christopher Faber, testified that he was asked to compare the .38 revolver found in the burgundy Crown Victoria to the two lead bullets recovered from Mr. Hall's body. Mr. Faber testified that both bullets were of the .38/.357 caliber class and, although he was unable to determine whether the bullets were fired from the same gun, that the two "bear the same class characteristics." Similarly, Mr. Faber was unable to determine definitively whether the two bullets were fired with the .38 revolver in this case. However, he indicated that the rifling in the revolver barrel had "6 lands and grooves on a left hand twist" and that the dimensions between the lands and grooves "were almost exactly the same as [the markings on] the bullets."

### F.     Security Footage

Det. Moran narrated as the security footage from the KIPP Academy parking lot was played for the jury. He described the relevant portion of the security footage, beginning at approximately 8:30 p.m. on July 29, 2013 when "a dark color four door vehicle pulls up, [and] backs into a spot in the same parking lot where Mr. Hall [wa]s found." His narration highlighted the moment when Mr. Hall's Ford Expedition pulled into the parking lot and a person from the other vehicle sat in the vehicle with Mr. Hall. After a few minutes, passed Det. Moran instructed:

12

If you could just pay attention to the door of the driver's side vehicle. The body falls out. The door opens up and the body falls out of the vehicle.

* * *

The individual walks around the back of the vehicle. See the lights on the bottom here?

* * *

The individual is standing next to the body. Still standing. The individual now bends over.

* * *

Still bent over. Now kneels down.

* * *

The individual stands up.    The door opens. See the lights?    He gets in. The door shuts. The brake lights come on. He backs up. He leaves the parking lot. Mr. Hall is still on the ground.

## G.    Codefendant's Refusal to Testify

On March 25, 2014, the State sought to call codefendant Derrick Toomer as a witness.    Toomer had already been convicted of Hall's murder, and his case was on appeal.    Toomer's counsel, Celia A. Davis, would later explain during a post-trial motions hearing that on the fourth day of trial, March 24, 2014, "after 5:00 p.m. [she] received a phone call from [the prosecutor] indicating that he wanted to speak to Mr. Toomer, [her] client, about his testimony in [Appellant's] murder case."    Ms. Davis testified that she then spoke with her client via video conference and arranged to speak to him again the following day at the courthouse.    After speaking with Toomer, Ms. Davis met with the prosecutor.    Regarding their conversation, Ms. Davis testified:

I told [the prosecutor] that my client would not testify. That he would invoke his Fifth Amendment rights. That [Toomer] was not interested in signing the immunity agreement, and he was well aware that he could be held in contempt of court.

Notwithstanding that exchange, at trial the State went ahead and called Derrick Toomer as a witness. The following occurred:

[THE STATE]: Your Honor, I apologize for approaching. Before I announced the witness in the presence of a jury, I just wanted to see if Mr. Toomer is here and his attorney and give them one last chance to reflect on the decision not to --

THE COURT: Do you want a break?

[THE STATE]: I think it is probably helpful just in light of the precariousness of this witness.

THE COURT: All right. All right. We'll get him in and see if there are any preliminaries we have to do before the jury comes down.

[THE STATE]: Thank you, Your Honor.

(At 10:39:59 a.m., counsel returned to trial tables and the following occurred in open court:)

THE COURT: Ladies and gentlemen, our next witness will take a moment to get set up, so why don't [I] give you a slight break. We'll bring you back hopefully in about five minutes.

(At 10:40:15 a.m., the jury left the courtroom.)

[THE STATE]: Your Honor, I'm going to step back and confirm my understanding with Mr. Toomer's attorney that nothing has changed.

THE COURT: Very well.

[THE STATE]: In all candor, given that we only have what we have here with Mr. Toomer, I would like to have Mr. Toomer for the first time in the

14

presence of the jury just start asking him questions without giving him a chance to be more (inaudible) than he probably is.

THE COURT: Very well.

[THE STATE]: I just wanted to make sure his counsel didn't want immunity, which I would want to do.

THE COURT: Very well.

[THE STATE]: Thank you, Your Honor.

(10:42:50 a.m. – Off the record.)

(10:50:56 a.m. – On the record.)

[THE STATE]: Your Honor, we're going to get [defense counsel], and I think we will be --

THE COURT: [Defense counsel] will be here momentarily. He is -- Sooner than momentarily.    Bring the witness in, please.

[THE STATE]: Do you want to bring him to the stand before the jury comes?

THE COURT: Is he ready to roll?

[THE STATE]: I believe he is.

THE COURT: Well then let's get the jury.

THE CLERK: All rise for the jury, please.

(At 10:52:56 a.m. the jury entered the room).

After Toomer answered some initial identifying questions, the following exchange occurred in front of the jury:

[THE STATE]: You're presently incarcerated. Is that correct?

15

[DERRICK TOOMER]: Yes.

[THE STATE]: Where are you currently incarcerated?

[DERRICK TOOMER]: North Branch Correctional Institution.

[THE STATE]: Mr. Toomer, you currently have an appeal that is pending is that right?

[DERRICK TOOMER]: Yes.

[THE STATE]: And you have an attorney representing you with respect to that appeal, correct?

[DERRICK TOOMER]: Yes.

[THE STATE]: Do you know her name?

[DERRICK TOOMER]: Celia Anderson Davis.

[THE STATE]: And is she present in the courtroom today?

[DERRICK TOOMER]:  Yes.

[THE STATE]: Has the State promised you anything in exchange for you taking the stand today?

[DERRICK TOOMER]: No.

[THE STATE]: Ms. Davis asked, in your presence, if the State would offer you anything and you recall the State indicating that we would not offer you anything.  Is that right?

[DERRICK TOOMER]: Yes.

[DEFENSE COUNSEL]: I think I should object.

THE COURT: Overruled.   Let's just get past this and get moving.

[THE STATE]: Thank You.

16

[DEFENSE COUNSEL]: Judge, I'm sorry --

[THE STATE]: Mr. Toomer, you were originally charged in the murder --

[DEFENSE COUNSEL]: -- let me be clear.

[DERRICK TOOMER]: I am invoking my Fifth Amendment right. I am not answering any more questions, sir.

[DEFENSE COUNSEL]: Judge, I want to say [Toomer's attorney] stood up. That's why I objected. I apologize. I don't mean "she" disrespectfully. I mean his lawyer stood up, his counsel.

THE COURT: Ms. Davis is here, yes.

[DEFENSE COUNSEL]: Okay

THE COURT: He acknowledged it. Ms. Davis is here.

[THE STATE]: Mr. Toomer, the State indicated to you that if you wish to invoke your Fifth Amendment privilege, the State was prepared to give you use and derivative use immunity to ensure that you would be compelled to testify. Do you recall that?

[DERRICK TOOMER]: I'm not trying to waste your time. I'm not answering any questions. I respectfully decline. I'm not going to answer any more questions from this point on.

[THE STATE]: Your honor, I can do this on the record in the presence of the jury, or I can do it at the bench to extend what I believe will compel him to testify.

[DEFENSE COUNSEL]: I'm going to object, Judge.

THE COURT: Let's excuse the jury again for a few minutes.

During the ensuing bench conference, the State explained that Toomer did not request immunity and that the State believed immunity was not necessary to compel

17

Toomer's testimony because he was already convicted. Nevertheless, the State was prepared to grant Toomer use and derivative use immunity in order to compel his testimony. Toomer's counsel averred that Toomer could not be compelled to testify because he had a pending appeal and his testimony could be used against him in a federal prosecution. The Court allowed the State to ask a few questions of Toomer—outside the presence of the jury—to "explor[e] whether there are any areas about which Mr. Toomer would be willing to talk."

Toomer, however, continued to refuse to answer any questions. The following exchange occurred:

> [DERRICK TOOMER]: I am not saying anything. I will not under no circumstances. Hold me in contempt. Give me the time. Let me go, please. Please, sir.
>
> THE COURT: Any other areas that you think might be an area that he would like to discuss.
>
> [THE STATE]: Mr. Toomer, can you tell us why you don't want to discuss any?
>
> [DERRICK TOOMER]: I'm not answering no more questions.
>
> [THE STATE]: Your Honor, can I ask the court to direct him to answer these questions?
>
> [DERRICK TOOMER]: This is my answer, but I will respond to the Court.
>
> THE COURT: The Court's not going to order him to answer the questions. That would accomplish absolutely and completely nothing. Mr. Toomer has made clear that anything that he would have to say that would be a benefit to the State or a benefit to Mr. Johnson is not going to be presented by him. . . .

18

THE COURT: . . . Is there any point in having Mr. Toomer presented any longer in this case?

[THE STATE]: Court's indulgence, Your Honor. Your Honor, I trust you would not allow me to, just to make it clear to the jury what's happening here, ask these questions?

THE COURT: I think the jury got a flavor of that already. Something that was unnecessary. I don't believe prejudicial, but we could have accomplished this before the jury even came down.

[THE STATE]: That was my aim, but I didn't appreciate that this was how it was going to unfold. So, I would apologize to the Court. I think that the State does not need to ask Mr. Toomer any questions.

THE COURT: Very well. Can we bid Mr. Toomer a fond farewell?

[DERRICK TOOMER]: Thank you. You have a nice day.

THE COURT: You do the same.

Thereafter, the court excused Toomer, and without objection the trial proceeded.

In closing argument, on March 26, the State used the .38 revolver as a prop without objection when it guided the jury through the evidence presented regarding the potential murder weapon. The State pointed to Kelly Toomer's testimony establishing that he and Appellant were both in the vehicle where the .38 revolver was found; ballistics evidence indicating that the bullets recovered from Mr. Hall's body were fired from a .38 revolver; and Nelson's description of the .38 revolver that he testified Appellant used in the murder. The State argued:

Before the ballistics confirmed that the bullet[s] that killed [Mr. Hall] were fired from a weapon with a six left twist, James Nelson told you it was this

.38 caliber revolver that Kelly Toomer was arrested with which happens to be a Colt revolver that an expert told you is one of the few weapons that has a six left twist.

Shortly thereafter, the jury found Appellant guilty on all counts.

## H.     Motion for a New Trial

On April 1, 2014, Appellant filed a motion for a new trial.   During two separate hearings held on April 23 and May 2, Appellant raised four arguments to support his motion: (1) that the State, in its closing rebuttal, raised facts not in evidence when it suggested that DNA evidence was found inside (rather than near) the victim's pants pockets;[5] (2) that the State improperly displayed a gun that had not been admitted into evidence during closing argument; (3) that the State improperly placed Derrick Toomer on the stand when it knew that he would assert his Fifth Amendment privilege and refuse to testify; and (4) that the State violated Maryland Rule 4-263(d)(6)(B) and the principles of *Brady v. Maryland*, 373 U.S. 83 (1963) by not disclosing that James Nelson was a State's witness in another unrelated murder case.

During the May 2, 2014 hearing, (as we already discussed) Derrick Toomer's attorney affirmed that she had advised the State that Toomer would invoke his Fifth Amendment privilege prior to his testimony.   Then, in support of his *Brady* violation charge, Appellant offered two exhibits, obtained as supplemental discovery in unrelated cases.   Appellant maintained that one disclosure revealed that Nelson was a witness in

---

[5] Appellant does not pursue this argument on appeal.

20

another homicide case and the other disclosure named "James Mitchell"—who Appellant believed was actually Nelson—as a witness.

The State rebutted Appellant's charge by calling Bethany Durand, the primary prosecutor in the other case in which Nelson was named as a witness. Ms. Durand testified that Nelson was given no promises, agreements or assurances in exchange for his testimony. Ms. Durand also testified that "James Mitchell" was indeed a separate person and that she was unaware of any other pending prosecutions in which Nelson was a witness.

The circuit court denied the motion for a new trial. In its oral ruling on May 2, 2014, the circuit court stated:

> As to . . . the admission of the gun and the demonstration of the gun to the jury, guns have taken on a different significance now. There's no question about that, but when an object is entered into evidence, it is fair game for it to be used as a prop in one's presentation to the jury and argument.
>
> * * *
>
> As to the involvement of Derrick Toomer in the trial, considering *Vandegrift*, and the analysis that I am to make, a few observations. Number one, his appearance here was brief. I will concede it was dramatic, but I do not think all things considered, it was prejudicial.
>
> * * *
>
> Now, as to the specific areas of concern. Was there anything about his presentation in the court that would have caused the jury to conclude, other than the other evidence that was presented, focusing on his presentation here, that he was particularly involved in the case or that [Appellant] was particularly involved in the case[?] We never got to that level. We got past him reluctantly even telling us who he was to the point of saying I'm not saying anything.
> Did the prosecution anticipate the assertion?
>
> * * *

21

Did they know he was going to assert his Fifth Amendment privilege particularly in the modern circumstance where immunity can be granted and the Court can then hold in contempt and accumulate some sentences against a person who refused to cooperate who's been given immunity[?] I don't know that they could absolutely anticipate that the power of my personality and the power of my office would not be able to at least encourage Mr. Toomer to participate here.

\* \* \*

As soon as Mr. Toomer's reluctance was demonstrated, I sent the jury out, and then we interviewed Mr. Toomer to develop, I assume, our joint group impression that there was nothing that could be done under any circumstances that would persuade Mr. Toomer to actually testify in this case.

\* \* \*

But counsel were given the full opportunity to address the jury and to make argument to them about any conclusions they should draw from this circumstance. Under the circumstances, I do not find that brief event in the course of a long trial to be of such significance as to cause the granting of a new trial.

Now, that brings us to the issue today. The new issue as to whether or not there was a violation of Maryland Rule 4-263(d)(6)(B) sufficient to cause the grant of a new trial. I am not satisfied that exists. I am not satisfied that upon consideration of the proffer of the State. . . plus the testimony of Ms. Durand, I do not believe there is any evidence whatsoever to suggest that there are any type of promises, inducements or benefits which have been presented to Mr. Nelson.

That same day, the circuit court sentenced Appellant to life in prison for the murder of Mr. Hall; 20 years for use of a handgun in a crime of violence (to run consecutive to the life sentence); five years without the possibility of parole for possession of a regulated firearm (also consecutive); and a concurrent sentence of life in prison for conspiracy to murder Mr. Hall. Appellant filed a timely notice of appeal on May 5, 2014.

Additional facts will be introduced as required in the following discussion.

22

## DISCUSSION

## I.

The central issue in this case is whether Appellant was denied his right to a fair trial when the State called his separately-tried-and-convicted codefendant, Derrick Toomer, before the jury with knowledge that Toomer would invoke his Fifth Amendment privilege. Before this Court, Appellant points out that by the time Toomer was called to testify, "the jury had heard much about [Toomer's] alleged involvement in the murder," and that "while Toomer's testimony in front of the jury was short, the jury was informed that he was incarcerated . . . [his case] was pending appeal, and watched him invoke his Fifth Amendment privilege just as the prosecutor asked him if he had been convicted of murder." Appellant maintains that there was "no confusion" about whether Toomer would invoke the privilege. He asserts that "[t]he prosecution's act of calling Derrick Toomer to the stand with full knowledge that he would invoke his Fifth Amendment privilege was an attempt to add critical weight to [the State's] case . . . and constituted flagrant misconduct."

The State advances the threshold argument that Appellant failed to object to Toomer's testimony at the time it was offered. To the extent that Appellant's claim of error may be preserved, however, the State underscores that the relevant case law "does not stand for the proposition that a prosecutor may never call a witness who declines to answer questions[.]" The State concedes that "Toomer's testimony was 'dramatic,'" but maintains that the trial court did not abuse its discretion in finding that the testimony was

23

not harmful to Appellant.

## Standard of Review

*Vandegrift*, *supra*, does not explicitly set out a standard of review for conducting the unique examination under its enumerated factors. We conclude, upon review of *Vandegrift* and its progeny, that although we will not hesitate to overturn a circuit court decision resting on erroneous legal conclusions, we accord deference to the court's weighing and balancing of the *Vandegrift* factors.

In *Adkins v. State*, the Court of Appeals related that the "*Vandegrift* factors serve [only] as guidelines to assess the overall circumstances of the invocation of the privilege." 316 Md. 1, 13 (1989). Where a trial court must determine whether evidence that was presented or an event that occurred during trial might unfairly prejudice the defendant, that finding is ordinarily accorded deference because the trial judge is best situated to evaluate the degree of harm to the defendant in the proceeding. For example, in *State v. Faulkner*, the Court of Appeals observed that, "[t]he necessity for and probative value of the 'other crimes' evidence is to be carefully weighed against any undue prejudice likely to result from its admission. This segment of the analysis implicates the exercise of the trial court's discretion." 314 Md. 630, 635 (1989) (internal citations omitted). Similarly, in assessing whether there is a reasonable basis for invocation of the privilege against self-incrimination, the trial judge, "in appraising the claim 'must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence.'"

*Richardson v. State*, 285 Md. 261, 266-67 (1979) (quoting *Hoffman v. United States*, 341

U.S. 479, 486-87 (1951)).

The Court of Appeals when addressing a mirror image of the present case—i.e.,

conducting an analysis of the *Vandegrift* factors where a *defendant* in a criminal case

sought to call a witness to the stand who intended to invoke his Fifth Amendment privilege

before the jury—has stated:

> We conclude that just as a trial court must determine whether a witness is properly invoking his Fifth Amendment privilege, the trial court must exercise its discretion and determine if a defendant will be unfairly prejudiced by the court not allowing the defendant to call a potentially exculpatory witness that the defendant and the trial court know will invoke his Fifth Amendment privilege in the presence of the jury.

*Gray v. State*, 368 Md. 529, 561 (2002). We note that many of the Maryland cases

involving the factors enumerated in *Vandegrift* and the concerns articulated in *Namet v.*

*United States*, 373 U.S. 179 (1963), appear before this Court challenging the denial of a

motion for mistrial, which we then review for abuse of discretion. *See, e.g.*, *Jones v. State*,

86 Md. App. 204, 210 (1991) ("[T]he decision to grant a mistrial is addressed to the sound

discretion of the trial court, the exercise of which is not to be disturbed on appeal in the

absence of abuse. Whether a trial court's ruling on a motion for mistrial is an abuse of

discretion is dependent upon the attendant circumstances." (internal citations omitted));

*Somers v. State*, 156 Md. App. 279, 291(2004) (citing *Klauenberg v. State,* 355 Md. 528,

552 (1999) ("The decision to grant or deny a motion for mistrial is within the sound

discretion of the trial judge."). *Cf. State v. Corrales*, 676 P.2d 615, 619 (Ariz. 1983) (en

25

banc) ("The correct rule . . . is that if the court finds that the fifth amendment will be properly invoked, it has discretion to determine whether to allow the proponent of the evidence to call the witness and elicit the claim of privilege before the jury."). We conclude that the ultimate decision of the circuit court, after balancing the *Vandegrift* factors in the context of the attendant circumstances, is entitled to deference and should not be disturbed absent an abuse of discretion.

### Codefendant Testimony and the Privilege against Self-Incrimination

The Fifth Amendment to the Constitution of the United States provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Similarly, Article 22 of the Maryland Declaration of Rights states "[t]hat no man ought to be compelled to give evidence against himself in a criminal case." Both guarantee witnesses a privilege against self-incrimination. However, as the Court of Appeals recently clarified in *State v. Rice, Nero & Miller*, and *White and Goodson v. State* (consolidated) (hereinafter *Rice*): "A witness's constitutional privilege, guaranteed by the Fifth Amendment to the United States Constitution and Article 22 of the Maryland Declaration of Rights, is preserved through application of immunity statutes, which balance the witness's privilege against compelled self-incrimination with the legitimate power of government to compel persons to testify." *State v. Rice*, ___ Md. ___, ___, Nos. 96, 97, 98 & 99, September Term 2015, slip op. at 2 (May 20, 2016). Citing *Kastigar v. United States*, 406 U.S. 441, 446-47 (1972), the Court noted that "immunity statutes have been

26

referred to as 'part of our constitutional fabric.'" *Id.*

*Rice* involved six Baltimore City police officers charged with crimes in connection with the events leading to the death of Freddie Gray. *Id.* slip op. at 1. Gray suffered injuries while in police custody and later succumbed to those injuries. *Id.* Officer William Porter was the first officer to stand trial. *Id.* That proceeding ended in a mistrial, and the State indicated its intention to retry Officer Porter. *Id.* However, the State also sought, pursuant to Maryland's Immunity statute found in the Maryland Code (1973, 2013 Repl. Vol., 2015 Supp.) Courts and Judicial Proceedings Article ("CJP"), § 9-123,[6] to

---

[6]  Section § 9-123, provides, in pertinent part:

(b) *Refusal to testify; requiring testimony; immunity.*—(1) If a witness refuses, on the basis of the privilege against self-incrimination, to testify or provide other information in a criminal prosecution or a proceeding before a grand jury of the State, and the court issues an order to testify or provide other information under subsection (c) of this section, the witness may not refuse to comply with the order on the basis of the privilege against self-incrimination.
(2) No testimony or other information compelled under the order, and no information directly or indirectly derived from the testimony or other information, may be used against the witness in any criminal case, except in a prosecution for perjury, obstruction of justice, or otherwise failing to comply with the order.

* * *

(d) *Prerequisites for order.*— If a prosecutor seeks to compel an individual to testify or provide other information, the prosecutor shall request, by written motion, the court to issue an order under subsection (c) of this section when the prosecutor determines that:
(1) The testimony or other information from the individual may be necessary to the public interest; and

compel Porter to give immunized testimony against the remaining officers. *Id.*

The Court of Appeals in *Rice* held that "the State's compelling Officer Porter to testify in the trials of his fellow officers, under the grant of use and derivative use immunity, did not violate Officer Porter's privilege against compelled self-incrimination . . . ."[7] *Id.* The Court declared that "[t]he grant of use and derivative use immunity under CJ[P] § 9-123 affords the same protection against compelled self-incrimination as invocation of the privilege itself[,]" *id.* slip op at 22, and that "the trial court lacks the discretion to deny a properly pled motion to compel immunized testimony," *id.* slip op. at 2.

---

(2) The individual has refused or is likely to refuse to testify or provide other information on the basis of the individual's privilege against self-incrimination.

[7]   The Court described the three varieties of immunity that have developed in American jurisprudence over the years:

"Use" immunity offers the least protection—although the State is barred from using any immunized testimony against the witness in a later criminal prosecution, the State is not precluded from using evidence derived from that testimony. *See* [*Kastigar*, 350 U.S. at 454] (providing that use immunity statutes do not "prevent the use of [the witness's] testimony to search out other testimony to be used in evidence against him or his property, in a criminal proceeding" (quoting *Counselman v. Hitchcock*, 142 U.S. 547, 564 (1892))).   On the other end of the spectrum is "transactional immunity," which precludes the State from prosecuting the witness for any conduct arising out of the substance of the witness's testimony.   *In re Criminal Investigation No. 1-162*, 307 Md. 674, 684 (1986).   Between those two ends is "use and derivative use" immunity, where the State is precluded from using in a later prosecution both the witness's compelled testimony and any information directly or indirectly derived from that testimony. *Id.*

*Id.* slip op. at 2-3.

In light of the clarification provided in *Rice*, it is pellucid that, where a witness invokes his or her Fifth Amendment privilege and the State has made a proper request pursuant to CJP § 9-123(d), the court is obliged to compel the witness to testify. But where a prosecutor fails to address the issue of compelled testimony outside of the presence of the jury, the prosecutor risks creating issues of constitutional dimension. Indeed, courts have recognized that, where a witness is asked about criminal activity in which he or she allegedly participated together with a codefendant, an assertion of the Fifth Amendment privilege may suggest to the jury the guilt of both the witness and the defendant. *See Namet*, 373 U.S. at 185-86 ("It is said that when a witness is asked whether he participated in criminal activity with the defendant, a refusal to answer based on the privilege against self-incrimination tends to imply to the jury that a truthful answer would be in the affirmative.").

Recognizing that risk many years ago, the Court of Appeals in *Vandegrift v. State*, *supra*, determined that it is impermissible for the State to call such a witness solely for the effect that the claim of privilege may have on the jury. 237 Md. at 309-10. The Court clarified:

> [W]e desire to make it clear that we do not mean to intimate that a State's Attorney is precluded from calling as a witness a codefendant in proper circumstances, nor do we intend to imply that when such a witness claims his privilege against self-incrimination prejudicial error necessarily results. The test is whether the State's Attorney calls the witness for the effect of the claim of privilege on the jury. Further, it should be noted that in [a] proper case a cautionary instruction by the trial judge to the jury might cure any error.

29

*Id.* To facilitate that analysis, *Vandegrift* lists "five requirements for a court's finding of prejudicial error" when a witness asserts his Fifth Amendment privilege in front of the jury. *Id.* at 308-09. All five factors need not be implicated "in order to support a reversal of a defendant's conviction." *Adkins v. State*, 316 Md. 1, 13 (1989) (citing *Vandegrift*, 237 Md. at 309); *see also Allen v. State,* 318 Md. 166, 177 (1989) (*"We did not state that each criterion [from *Vandegrift*] must be satisfied in order to find prejudicial error in a given case. Rather, we emphasized that the test to be applied in cases involving a witness is whether the State calls the witness for the effect of claiming the privilege in the presence of the jury." (citing *Vandegrift*, 237 Md. at 309)).

The *Vandegrift* factors are:

1. that the witness appears to have been so closely implicated in the defendant's alleged criminal activities that the invocation by the witness of a claim of privilege when asked a relevant question tending to establish the offense charged will create an inference of the witness' complicity, which will, in turn, prejudice the defendant in the eyes of the jury;

2. that the prosecutor knew in advance or had reason to anticipate that the witness would claim his privilege, or had no reasonable basis for expecting him to waive it, and therefore, called him in bad faith and for an improper purpose;

3. that the witness had a right to invoke his privilege;

4. that defense counsel made timely objection and took exception to the prosecutor's misconduct; and

5. that the trial court refused or failed to cure the error by an appropriate instruction or admonition to the jury.

*Vandegrift*, 237 Md. at 308-09 (internal quotation marks omitted). We now apply the *Vandegrift* factors to the case on appeal.

### a. Implication and a Relevant Question

The first *Vandegrift* factor requires that the court find the witness appeared to have been "closely implicated in the defendant's alleged criminal activities" so that the "invocation by the witness of a claim of privilege when asked a relevant question tending to establish the offense charged" created an inference of the witness's complicity which prejudiced the defendant in the eyes of the jury. 237 Md. at 308. In *Vandegrift*, this factor was satisfied where "[t]he witnesses were codefendants with the appellant, their names had been mentioned previously during the testimony of the complaining witness in relation to the circumstances of the crime charged and they were asked a question relevant to the offense." 237 Md. at 309.

Applying this *Vandegrift* test in *Adkins v. State*, the Court of Appeals concluded that "it [wa]s evident that [a codefendant witness] was 'closely implicated in the defendant's alleged criminal activities'" where the witness "was earlier convicted of felony murder for his role in the [crime, and his] conviction, pending on appeal, arose out of the same facts and events underlying the charges against [the appellant]." 316 Md. at 13 (citing *Ellison v. State*, 310 Md. 244, 258-59 (1987)). Under those circumstances the Court concluded that the first *Vandegrift* factor was "unquestionably satisfied." *Id.*

In the matter *sub judice*, it is similarly clear that the testimony of several witnesses

31

implicated both Appellant and the witness, Derrick Toomer, in the murder of Mr. Hall. As in *Adkins*, the witness, Toomer, was earlier convicted of a crime arising out of the same facts and events underlying the charges against Appellant. The State argues that the preliminary questions asked of Toomer could not have caused prejudice because they were not relevant to the offense with which Appellant was charged. But we cannot ignore completely the context in which the questions were asked. Toomer invoked his Fifth Amendment privilege just as the prosecutor said "Mr. Toomer, you were originally charged in the murder . . . ." The record demonstrates that Mr. Toomer appeared to have been "closely implicated in the defendant's alleged criminal activities" so that his invocation of his Fifth Amendment privilege after he was put on the stand and asked whether he was originally charged in a murder weighs heavily against the State under the first *Vandegrift* factor. *See Adkins*, 316 Md. at 13. As we shall explain, however, after weighing all factors we conclude the circuit court did not err in finding that Toomer's brief appearance on the stand was ultimately not prejudicial.

### b.     Calling the Witness In Bad Faith and for Improper Purpose

*Vandegrift's* second factor is

> that the prosecutor knew in advance or had reason to anticipate that the witness would claim his privilege, or had no reasonable basis for expecting him to waive it, **and therefore, called him in bad faith and for an improper purpose**;

*Vandegrift*, 237 Md. at 308-09 (emphasis added) (internal quotation marks omitted). In

*Vandegrift*, the victim was assaulted and beaten by several young men, including appellant,

in the early morning hours of January 18, 1964. *Id*. at 306. The appellant contended

that he was prejudiced when the State's Attorney called several codefendants to the stand

who had not as yet been tried, knowing that they would refuse to testify on the grounds of

self-incrimination. *Id*. at 307. The Court determined that the State's Attorney did not act

in good faith where "[i]t [wa]s obvious that the only inference to be drawn from his

comments is that he knew the witnesses would not answer his questions concerning the

crime." *Id.* at 309.

Unlike the witnesses in *Vandegrift*, Mr. Toomer had already been tried and

convicted. Nevertheless, it is clear from the record that prior to calling Toomer to the

stand the State understood that he intended to invoke his Fifth Amendment privilege. At

trial the prosecutor said he "just wanted to see if Mr. Toomer is here and his attorney and

give them one last chance to reflect on [his] decision. . . ." After "confirm[ing] his

understanding with Mr. Toomer's attorney that nothing ha[d] changed[,]" the prosecutor

requested to "have Mr. Toomer for the first time in the presence of the jury. . . ."

We are mindful that the prosecutor apologized for the misstep and stated "I did not

appreciate that this was how it was going to unfold." Similarly, the circuit court,

addressing whether the prosecutor could have anticipated that Toomer would continue to

refuse to testify, stated:

> Did [the State] know [Toomer] was going to assert his Fifth
> Amendment privilege particularly in the modern circumstance where
> immunity can be granted and the Court can then hold him in contempt and
> accumulate some sentences against a person who refused to cooperate who's

33

been given immunity. I don't know that they could absolutely anticipate that the power of my personality and the power of my office would not be able to at least encourage Mr. Toomer to participate here.

Under the *Vandegrift* analysis, the question is not whether the prosecutor believed it may be possible to convince or compel the witness to testify once he or she is on the witness stand, but whether "the prosecutor . . . had reason to anticipate that the witness would claim his privilege, or had no **reasonable** basis for expecting him to waive it." *See id.* (emphasis added); *cf. Allen*, 318 Md. at 175 (observing that, in *Vandegrift*, "the State's Attorney did not act in good faith since it could be reasonably inferred that he knew the witnesses would not answer his questions relating to the crime").

In the present case, although it is not clear that the prosecutor had a reasonable basis for expecting Toomer to waive the privilege, nevertheless, the circuit court did not conclude that he "call[ed] the witness for the effect of the claim of privilege on the jury." *See Vandegrift*, 237 Md. at 309. Nor do we so conclude, based on this record. During direct examination of Toomer, the State made clear that it "was prepared to give [Toomer] use and derivative use immunity to ensure that [Toomer] would be compelled to testify[,]" and informed the court that "[t]he State is prepared to give that level of immunity to Mr. Toomer in order to compel his testimony here today." Indeed, when Toomer invoked his Fifth Amendment privilege initially, the prosecutor advised the court, "Your honor, I can do this on the record in the presence of the jury, or I can do it at the bench to extend what I believe will compel him to testify." As noted above, the circuit court also apprehended

34

that the State's aim was to rely on the power of the court to either coerce or compel Toomer to testify. Although the circuit court ultimately declined to compel Toomer, it inquired of Toomer's counsel, "[h]ave you discussed with your client what he would do if the proper immunity were granted to him by the State's Attorney and the Court ordered him to testify[?]"

We recognize that the State was not incorrect in its contention that it could seek to compel Toomer to testify through a grant of use and derivative use immunity. *See Rice*, *supra*, ___ Md. at ___, slip op. at 2. Unlike in *Rice*, however, the State did not avail itself of the procedures provided in CJP § 9-123, nor did the State seek to resolve the issue outside the presence of the jury. For this reason, although not dispositive, the second factor of the *Vandegrift* test weighs against the State.

### c. Right to Invoke the Fifth Amendment Privilege

"In a jury trial, when a witness invokes his Fifth Amendment right against self-incrimination, or it is known that he will do so, the court must determine whether the witness's invocation of that right is proper[.]" *Dickson v. State*, 188 Md. App. 489, 506 (2009) (citing *Hoffman,* 341 U.S. at 487-88). "The substantive standard guiding the court's inquiry is whether there is reasonable cause for the witness to fear self-incrimination from a direct answer to the question posed, or from an explanation of the failure to answer, and whether the danger of self-incrimination is evident from the nature

of the question and the circumstances of the case." *Id.* (citing *Choi v. State,* 316 Md. 529, 536-37 (1989)). In *Richardson v. State*, the Court of Appeals observed:

> To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. The trial judge in appraising the claim "must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence."

285 Md. at 266 (citations omitted). The Court of Appeals articulated a two-part inquiry in *Bhagwat v. State*: "(1) whether there is a reasonable basis for the invocation of the privilege; and (2) whether the privilege is invoked in good faith[.]" 338 Md. 263, 272 (1995) (citations omitted).

Our decisional law instructs that the privilege against self-incrimination "must be accorded liberal construction[.]" *Hoffman*, 341 U.S. at 486. Indeed, the Court of Appeals "has repeatedly emphasized that the privilege against compelled self-incrimination, under both the Fifth Amendment and Art. 22 of the Declaration of Rights, must be accorded a liberal construction in favor of the right that it was intended to secure." *Choi*, 316 Md. at 536 (citations and internal quotation marks omitted).

In the present case, Toomer's conviction was pending on appeal, and, were he to prevail on appeal and be retried, any unimmunized testimony given in Appellant's trial may have been used against him. Additionally, Toomer's appellate counsel raised the

specter of federal charges.[8] Toomer answered identifying questions and only invoked the Fifth Amendment privilege against self-incrimination after the State propounded a question regarding "murder." Viewed through the lens of "liberal construction"—and in the limited context of the *Vandegrift* test—we conclude that Toomer had some reasonable basis for invoking the privilege and that he did so in good faith. *See Bhagwat*, 338 Md. at 272 (citations omitted). Moreover, we note that, as the Court recognized in *Richardson*, "if the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee." 285 Md. at 266.

### d. Timely Objection and Exception to Prosecutor Misconduct

We address the fourth *Vandegrift* factor in conjunction with the State's argument that Appellant failed to preserve its claims regarding Derrick Toomer's testimony. The general rule regarding the preservation of issues and scope of review, provides in pertinent part:

---

[8] After Toomer invoked his Fifth Amendment privilege, the circuit court asked Toomer's counsel how Toomer's answers could be used against him given that he had already been convicted. Toomer's counsel, Ms. Davis, responded, "I think they might be able to be used against him in a federal prosecution, for example. Not likely, but possible." The prosecutor responded, "this is the first time hearing of federal prosecution. I'm not sure what federal jurisdiction would lie over this particular murder, but even if that were the case, the State could certainly make that request." From the record in this case, it does not appear that Toomer has been charged at the federal level.

> Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal.

Md. Rule 8-131(a).  Interestingly, in *Vandegrift*, the Court of Appeals determined that the appellant did not preserve for appellate review the question of whether he was prejudiced by the State's decision to call codefendants to the stand, knowing they would refuse to testify.  *Vandegrift*, 237 Md. at 307.  The Court explained that "[t]he attorney for the appellant . . . did not object to the actions of the State's Attorney at the time; moreover, he did not ask that the jury be instructed to disregard the actions, or move for mistrial . . . ." *Id*.  Because the judgment in that case required reversal on another ground, however, the Court decided to address the issue, outlining the test that continues to serve as an important safeguard in Maryland's criminal jurisprudence.

In the case at bar, the State correctly notes that during Toomer's examination, Appellant's first objection was specifically to the fact that Toomer's attorney, Celia Davis, stood up at the trial.   Then, after the State indicated that it was prepared to compel Toomer to testify in front of the jury, Appellant's counsel objected a second time.   Although counsel did not state the specific reason for his objection at that time, we are mindful of the broader context—in which the State, defense counsel, and counsel for Toomer had been contesting whether it was proper to call Toomer before the jury after he had stated his intention to invoke the Fifth Amendment privilege.   Indeed, addressing this issue at the hearing on Appellant's motion for a new trial, the circuit court stated, "I'm satisfied that

38

the defense put us on notice that the defense didn't want this show to take place."

Likewise, we conclude that the issue was raised in the trial court sufficiently to bring it on appeal before this Court. *See* Md. Rule 8-131(a).

Notwithstanding our conclusion that the issue is properly before this Court, we note that the fourth factor, as articulated in *Vandegrift*, requires that Appellant make a "timely objection *and* t[ake] exception to the prosecutor's misconduct." 237 Md. at 309 (emphasis added). On March 25, *counsel for Mr. Toomer* certainly interjected and argued to preserve Toomer's right not to be required to present evidence against himself. Appellant's counsel, on the other hand, following his general objection after Toomer invoked that privilege, did not participate in the discussion regarding Toomer's testimony or the ability of the court to compel Toomer to testify. Thus, it cannot be said that Appellant made the circuit court aware of any concerns regarding alleged prosecutor misconduct.

The Court in *Vandegrift* found that the fourth factor was not satisfied because the appellant failed to ask that a curative instruction be given and failed to move for a mistrial. *Id.* at 307. Likewise, in the present case Appellant never requested any curative instruction or action, nor did he move for a mistrial. After Toomer was excused, Appellant made no arguments of error or requests for relief of any kind, and the State simply moved on to the next witness. Although Appellant's general objection was sufficient to place the broader issue before this Court, this *Vandegrift* factor is not satisfied

and weighs against reversal.

### e.      Appropriate Instruction or Admonition

The final factor in the *Vandegrift* test asks us to determine whether "the trial court refused or failed to cure the error by an appropriate instruction or admonition to the jury." 237 Md. at 309.    Here, as noted above, Appellant never requested any type of curative instruction, action, or admonition from the circuit court.    Indeed, the first time Appellant raised the contention that the State endangered his right to a fair trial by calling Toomer was in the hearing on Appellant's motion for a new trial on April 23, 2014—nearly a month after Appellant's trial and conviction.[9]    Notwithstanding Appellant's failure to apprise the trial court of his concerns about Toomer's reliance on the Fifth Amendment privilege in front of the jury, the court was quick to act on its own initiative.    The circuit court recounted what occurred at trial during its May 2 oral ruling:

> As soon as Mr. Toomer's reluctance was demonstrated, I sent the jury out, and then we interviewed Mr. Toomer to develop, I assume, our joint group impression that there was nothing that could be done under any circumstances that would persuade Mr. Toomer to actually testify in this case.
>
> * * *
>
> But counsel were given the full opportunity to address the jury and to make argument to them about any conclusions they should draw from this

---

[9] Appellant's motion for a new trial and request for hearing, filed April 1, 2014, provided that the grounds for the motion were as follows:

1. The verdict was against the weight of the evidence.
2. The evidence was insufficient as a matter of law.
3. And for further reasons as may be offered at the hearing on this motion and in the interest of justice.

circumstance. Under the circumstances, I do not find that brief event in the course of a long trial to be of such significance as to cause the granting of a new trial.

We agree.

It is plain from the record that the prosecutor, entertaining some slight hope, sought repeatedly to require the witness to either answer questions or claim the privilege in front of the jury. Even when the court declined to compel Toomer to testify and was preparing to dismiss Toomer, the State persisted:

> [THE STATE]: Court's indulgence, Your Honor. Your Honor, I trust you would not allow me to, just to make it clear to the jury what's happening here, ask these questions?

> THE COURT: I think the jury got a flavor of that already. Something that was unnecessary. I don't believe prejudicial, but we could have accomplished this before the jury even came down.

Nevertheless, "it is not always reversible error for the prosecution to call a witness whom it has reason to believe will refuse to testify based upon the Fifth Amendment." *Allen*, 318 Md. at 174 (citing *Namet*, 373 U.S. at 187). Rather, it "must be judged from the attending circumstances narrowly focusing on the purpose and consequences of the event in question." *Id.* at 174-75 (citation omitted). Moreover, we note that in such cases "the trial judge might cure any error." *Id.* at 176 (quoting *Vandegrift*, 237 Md. at 310).

Long before *Appellant* raised any specific issue with the State's conduct in calling Toomer, a great deal of evidence was presented in this case. Notably, the State's principal witness testified that Appellant admitted his role in Mr. Hall's murder and had discussed it

with him "eight or nine times." Appellant was also linked to the .38 revolver through the testimony of three separate witnesses, including a police officer who recovered the weapon from a vehicle driven by Appellant. Expert testimony presented by the State revealed that the bullets recovered from Mr. Hall's body were consistent with having been fired by the same caliber, make, and model of weapon as that recovered from the vehicle. Additionally, DNA evidence placed Appellant in Mr. Hall's Ford Expedition, and Appellant could not be excluded as a contributor to DNA found on Mr. Hall's body. Security footage played for the jury also showed the murder being committed by a man who arrived at the scene in a vehicle that witness testimony connected to Appellant and Toomer. Moreover, as the State points out, although Toomer's brief testimony was "dramatic," "[i]t does not . . . follow that the testimony was harmful to [Appellant]." The jury might reasonably have drawn an inference contrary to the State's theory of the case— inferring, for example, that Toomer, not Appellant, was the shooter.

Because the circuit court in this case acted swiftly to halt questioning and excuse the jury, we agree that the "brief event in the course of a long trial"—in which a great deal of evidence was presented to support conviction—was not of such significance to prejudice the proceedings and warrant a new trial. Balancing all of the *Vandegrift* factors, we conclude that the actions of the prosecutor in the case before us—although not a model to follow—were not unduly prejudicial, nor were they calculated solely to gain the benefit of "the effect of the claim of privilege on the jury." *See Vandegrift*, 237 Md. at 309.

42

Therefore, we hold the circuit court did not abuse its discretion in concluding that Toomer's brief testimony during the course of a long trial was not prejudicial and did not deny Appellant his right to a fair trial.

## II.

## Motion for a New Trial

"Whether to grant a new trial lies within the sound discretion of the trial court, whose decision will not be disturbed on appeal absent an abuse of discretion." *Brewer v. State*, 220 Md. App. 89, 111 (2014) (citing *Argyrou v. State,* 349 Md. 587, 600 (1998)). "We do not consider that discretion to be abused unless the judge exercises it in an arbitrary or capricious manner or when he or she acts beyond the letter or reason of the law." *Id.* (citations and internal quotation marks omitted).[10]

### a.      Testimony of Codefendant

Appellant argues that the circuit court erred in not granting his motion for a new trial where additional testimony presented at the motions hearing made clear that the State was aware that Toomer intended to invoke his Fifth Amendment privilege.   As we

---

[10]    We note also that, had Appellant moved for a mistrial at the time of Toomer's testimony before the jury (rather than filing a post-trial motion), the denial of such a motion would still be reviewed under the abuse of discretion standard, "because the 'trial judge is in the best position to evaluate whether or not a defendant's right to an impartial jury has been compromised.'"   *Scribner v. State*, 219 Md. App. 91, 106, (quoting *Dillard v. State,* 415 Md. 445, 454 (2010)), *cert. denied*, 441 Md. 63 (2014)).   However, as noted above, Appellant failed to specifically raise the issue prior to the April 23, 2014 hearing.

concluded in our analysis above, it was clear from the record that "the prosecutor . . . **had reason to anticipate** that the witness would claim his privilege." *See Vandegrift*, 237 Md. at 308-09 (emphasis added). Ms. Davis's May 2, 2014 testimony—that she told the State on the morning before Toomer was called as a witness that Toomer "would not testify" and "would invoke his Fifth Amendment rights"—certainly bolsters that conclusion. However, after balancing all the *Vandegrift* factors and for all the reasons already explained, we conclude that the circuit court did not abuse its discretion in denying Appellant's motion for a new trial.

### b. *Brady* Violation

Appellant asserts that the trial court erred in failing to grant him a new trial on the ground that the State failed to disclose impeachment information relating to witness James Nelson. Specifically, Appellant argues that "the State failed to disclose the fact that Nelson was a State's witness against at least two other murder defendants whose cases (unrelated to appellant's) were pending at the time of his testimony." Appellant maintains that disclosure of this information was required pursuant to Md. Rule 4-263 and *Brady v. Maryland*, 373 U.S. 83 (1963). Appellant urges that the failure to disclose this "impeachment evidence" deprived Appellant of his Sixth Amendment right to confront the witness and his right to a fair trial. The State responds simply that there is no *Brady* violation "when the State fail[s] to disclose that one witness is also a witness in a different case."

44

In *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. The Court of Appeals in *Yearby v. State*, recognized that "[t]here are, however, limits to the prosecutor's automatic duty of disclosure[,]" and that, in the cases since *Brady*, the principle has been refined. 414 Md. 708, 716-17 (2010) (citations omitted). "As the Supreme Court has explained, 'a rule that the prosecutor commits error by any failure to disclose evidence favorable to the accused, no matter how insignificant, would impose an impossible burden on the prosecutor and would undermine the interest in the finality of judgments.'" *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 675 n.7 (1985). The Court of Appeals stated in *Yearby*:

> "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."

*Id.* at 717 (quoting *Strickler v. Greene,* 527 U.S. 263, 281-82 (1999)). These principles are also enshrined in Maryland Rule 4-263(d), which provides, in pertinent part:

> Without the necessity of a request, the State's Attorney shall provide to the defense:
>
> * * *
>
> (6) Impeachment Information. All material or information in any form, whether or not admissible, that tends to impeach a State's witness, including:
>
> * * *
>
> > (B) a relationship between the State's Attorney and the witness, including the nature and circumstances of any agreement,

45

understanding, or representation that may constitute an inducement for the cooperation or testimony of the witness[.]

Here, the evidence and testimony presented at the post-trial motions hearings on April 23 and May 2, 2014, established that Nelson was a witness in *one* other homicide case. Regarding the first component of the *Brady* analysis, we recognize that this fact, if presented to a jury, could be minimally favorable to the accused in so far as it might establish that Nelson was amenable to cooperation with the State to the detriment of other defendants. However, this case is quite distinct from one such as *State v. Williams*, in which the State failed to disclose that its witness

> was, and had been, for at least 10 years, a paid and registered police informant for the Baltimore City Police Department, Eastern District Drug Unit, with his own confidential informant number. Moreover, he had cooperated with the State's Attorney's Office in a number of cases, involving narcotics, weapons and homicide, leading to numerous arrests.

392 Md. 194, 200 (2006) (footnote omitted).

In the instant case, Nelson testified that he was neither threatened nor promised anything in exchange for his testimony in Appellant's case. Appellant had the opportunity to cross-examine Nelson extensively regarding his testimony in various cases and his communications with police and prosecutors. Further, at the May 2 motions hearing, Bethany Durand—the primary prosecutor in the other case in which Nelson was named as a witness—testified that Nelson was given no promises, agreements or assurances in exchange for his testimony in that case.

The uncontroverted testimony was that there were no promises, agreements or assurances in exchange for Nelson's testimony in either case, so it is unclear what impeachment value the non-disclosed information could have had. Impeachment evidence is "[e]vidence used to undermine a witness's credibility." Blacks Law *Dictionary* 676 (10th ed. 2014). As Professor McLain observed:

> A witness may be impeached in two conceptually different ways.
> First, one may impeach by showing that the witness, though possibly well-intentioned, has given inaccurate testimony due to faulty perception, memory, or ability to communicate.
>
> * * *
>
> Second, one may impeach by showing that the witness is likely to be lying. This showing may be made by proving the witness's prior criminal convictions, other bad acts probative of untruthfulness, inconsistent statements, bias, interest, or other improper motive, bad reputation for truthfulness or a character witness's poor opinion of the witness's character for truthfulness, or mental incapacity to tell the truth, and by other witnesses' contradictory testimony as to material facts.

6 Lynn McLain, *Maryland Evidence: State and Federal* § 607:1 (3d ed. 2013) (footnotes omitted).

The record reflects that Appellant took the opportunity to cross-examine Nelson regarding any potential bias or improper motive. This weighs against any contention that Appellant was prejudiced by the State's inadvertent omission. "Evidence is material under *Brady* when 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence in the verdict.'" *Williams*, 392 Md. at 229 (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)). Evidence establishing

47

merely that Nelson was a witness in one other homicide case, without more, does not reach that standard. We agree with the circuit court's determination that there was no violation of Maryland Rule 4-263(d)(6)(B) or the principles announced in *Brady* sufficient to warrant the grant of a new trial.

### c.    Use of the Handgun in Closing Argument

Finally, Appellant argues before this Court that "the prosecution improperly used the .38 revolver in closing argument, which had not been admitted into evidence, in support of its assertion that it was the murder weapon used by [A]ppellant." Appellant maintains that "[t]he trial court was incorrect in its finding that [the revolver] had been admitted and, in basing its ruling on that finding, abused its discretion." We can dispense with this argument summarily. The .38 revolver was admitted into evidence without objection, as State's Exhibit 20, on March 21, 2014, during the testimony of Detective Reginald Jones.

### CONCLUSION

The Court of Appeals cleared away any doubt that the State may compel a witness to testify under a grant of use and derivative use immunity in *Rice*, *supra*, and that, through CJP § 9-123, a prosecutor is entitled to an order compelling testimony once properly sought by written motion. ___ Md. at ___, slip op. at 2, 22. We recognize that the instant case proceeded to trial well before the Court of Appeals issued its decision in *Rice*. Nevertheless, here the prosecutor offered Toomer immunity and hoped the court would compel his testimony, but then the prosecutor failed to avail himself of the procedures for

48

obtaining an order to compel testimony contained in the immunity statute first enacted in 1989.[11] In a case where the prosecution has no reasonable basis for believing that a witness will waive his or her Fifth Amendment privilege, the proper course is to address the issue outside the presence of the jury. *See Allen*, 318 Md. at 174. In so doing, the prosecution may thoughtfully avoid the appearance of having called a witness for the effect of the claim of privilege on the jury and, thus, avoid potential prejudicial error.

In the case at bar, the circuit court acted expeditiously to minimize any negative effect from Toomer's refusal to testify by halting questioning and excusing the jury immediately. In light of the circuit court's quick action, the record reflects that Appellant was not inclined to (and did not) request any further relief during the course of the trial. Indeed, Appellant failed to present any specific argument regarding the impropriety of calling Toomer as a witness or allege any prejudice created thereby prior to his post-verdict motion for a new trial. Weighing the *Vandegrift* factors in context, we agree with the circuit court that this "brief event in the course of a long trial" did not prejudice the Appellant and does not warrant a new trial. Moreover, we perceive no error in the circuit court's denial of Appellant's motion for a new trial and conclude that Appellant was not denied his right to a fair trial. We affirm.

> **JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED.**

---

[11] The State filed a Motion to Compel Officer Porter's testimony under CJP § 9-123 in Officer Goodson's case on January 6, 2016. *Rice*, ___ Md. at ___, slip op. at 7.

**COSTS TO BE PAID BY APPELLANT.**